# Tuscaloosa Ice Manufacturing Co. v. Williams.

*Action for the Breach of a Contract.*

1. *Contract; invalid when in restraint of trade.*—A contract entered into between two industrial companies, manufacturing similar commodities and located in the same town, by which

[Tuscaloosa Ice Manufacturing Co. v. Williams.]

one of them binds itself for a monied consideration, that it will not be operated for a space of five years, and in the event its plant is sold to any competing industry it will release the other from payment of the agreed consideration remaining due at the time of such sale, is an undertaking in restraint of trade, and is unreasonable and vicious, and, therefore, void, as being against public policy; and the fact that the restraint to trade imposed by such contract is limited as to time and territory is immaterial and can not render it a valid and binding obligation.

2. *Same; same; void when creating a monopoly.*—Where the only two ice companies located in a given city, in which the demand for ice was sufficient to consume and render marketable the output of both factories, enter into a contract by which one of the companies agrees for a monied consideration to close down and not operate its factory in said city for a space of five years, and further that in the event its plant is sold to any competitive industry it will release the other company from the agreed consideration remaining due at the time of said sale, and further provision is made for the reduction of the consideration to be paid in the event any other ice factory is established in said city, such contract is void and unenforceable, not only as being in restraint of trade, but as tending to injure the public by stifling competition and creating a monopoly, all of which is contrary to public policy.

3. *Same; same; same.*—A monopoly was none the less created by such a contract, because the contract itself evidenced a contemplation on the part of the parties that other ice manufacturies might be established in said city, or that notwithstanding the existence of said contract, ice might be brought into the city from other places.

4. *Same; same; ice a necessity.*—The fact that the commodity, the manufacture of which was intended to be monopolized, is ice, does not prevent such a contract being against public policy, since, in this latitude, and in cities of several thousand inhabitants, as was the city named in the contract, ice is one of the common necessities of life.

APPEAL from the Tuscaloosa Law and Equity Court. Tried before the Hon. JAMES J. MAYFIELD.

The question presented on the present appeal arose upon the rulings of the trial court in sustaining a demurrer to a plea filed by the defendant. The complaint and the plea interposed thereto by the defendant are set forth at length in the opinion. To this plea the defend-

ant demurred upon the following grounds: "1. For that said plea sets up no facts in bar of plaintiff's recovery, but is a conclusion of the pleader in that it states the effect of the contract sued on. 2. For that said plea sets up no facts showing that the contract sued on is one in unlawful restraint of trade. 3. For that said plea does not show that said contract was not a legitimate one for the prevention of ruinous competition between the parties thereto. 4. For that said plea does not show that there were not sources of supply to the inhabitants of Tuscaloosa, from neighboring cities which would prevent defendant from having a monopoly by reason of said contract and from charging unreasonable prices for its product. 5. For that said plea does not show that said contract was an unreasonable one. 6. For that said plea shows that if said contract is in unlawful restraint of trade, the defendant is in equal wrong, and can not set such illegality up as defense to this action. 7. For that said plea shows that the article manufactured by defendant is ice, not an article of necessity. 8. For that said plea does not show that said contract was purely and simply in restraint of trade or that plaintiff was to share in any increased profit of defendant, arising by reason of such contract. 9. For that said plea sets up no facts in bar of plaintiff's recovery."

The court sustained this demurrer, and the defendant declining to plead further, judgment was rendered for the plaintiff. The defendant appeals, and assigns as error the sustaining of the demurrer to the plea interposed by it.

FITTS & FITTS, for appellant.—The contract involved in this case is void as against public policy, and the trial court erred in reaching the contrary conclusion. While the appellee must admit that the contract is in restraint of trade, he will insist that the restraint is not violative of public policy because the restraint is partial and not unlimited as to territory and duration. The modern doctrine is well nigh universal that when one engaged in any business or occupation sells out his

[Tuscaloosa Ice Manufacturing Co. v. Williams.]

stock in trade and good will or his professional practice, he may contract with the purchaser and bind himself not to engage in the same vocation in the same locality for a time named, and he may be enjoined from violating this contract. This is about as far as contracts in restraint of trade have been upheld by the American courts and those of England.—2 Beach on Modern Law of Contracts, p. 2046, § 1575. The Alabama cases certainly go no further.—*Robbins v. Webb,* 68 Ala. 399; *Moses v. Scott,* 84 Ala. 608; *Hardware Co. v. Towers,* 87 Ala. 206; *Howard v. Taylor,* 90 Ala. 241. To further demonstrate that the extent of the rule is no greater than this, see also *Diamond Match Co. v. Ruba,* 106 N. Y. 163; *Leslie v. Lorrillard,* 110 N. Y. 519; 2 Beach on Modern Law of Contracts, 2045, § 1574; 2063, § 1588; 9 Amer. & Eng. Encyc. of Law, 895; Clark on Contracts, p. 458; *Moore v. Bennett,* 140 Ill. 69; *Hooker v. Vandiwater,* 4 Denio (N. Y.) 349; *Stanton v. Allen,* 5 Denio. 434; *Gen. Ohio S. Co. v. Guthrie,* 35 Ohio St. 666.

FOSTER & OLIVER, *contra.*—The modern doctrine is that a contract in restraint of trade is not unlawful if it is not unreasonable, and not necessarily injurious to the public.—*Oakdale Manfg. Co. v. Garst,* 28 Atl. Rep. 973; *Rousillon v. Rousilion,* L. R. 14 Ch. Div. 365; Greenhold's Public Policy, rule 543; Pollock on Contracts, 311; Clark on Contracts, 453-459 and 460; *Oregon Steam Navigation Co. v. Windsor,* 87 U. S. 64; Dissenting opinion of Mr. Justice WHITE in *United States v. Trans-Mississippi Freight Association,* 166 U. S. 290; *Matthews v. Associated Press of New York,* 136 N. Y. 333; *Diamond Match Co. v. Roeber,* 106 N. Y. 473; *Printing & Registering Co. v. Sampson,* L. R. 19 Eq. 465.

The contract which is the foundation of this action is not in unlawful restraint of trade. See authorities cited above, also *Sharpe v. Whiteside,* (note) 19 Fed. Rep. 155; *Hanforth v. Jackson,* 22 N. E. Rep. 634; *Leslie v. Lorrillard,* 110 N. Y. 519; *Hodge v. Sloan,* 17 N. E. Rep. 335; *French v. Parker,* 16 Atl. Rep. 219; *Na-*

8

*tional Benefit Association v. Union Hospital Co.*, 11 L. R. A. 437; Norton on Bills & Notes, 274; *Re Corning,* 51 Fed. Rep. 205; *Re Terrell*, 51 Fed. Rep. 213.

McCLELLAN, C. J.—B. H. Williams is plaintiff, and The Tuscaloosa Ice Manufacturing Co. is defendant in this action. The complaint is as follows: "The plaintiff claims of the defendant the sum of three hundred and twenty-five dollars with interest from the 1st day of September, 1898, as damages for the breach of a contract or agreement entered into between the plaintiff and defendant on, to-wit, the 1st day of January, 1898, in substance as follows: This agreement made and entered into between the Tuscaloosa Ice Mfg. Co., of which Henry B. Gray is president, of the first part, and B. H. Williams, sole owner of an ice machine located near the Alabama Great Southern Railroad depot, at Tuscaloosa, Ala., of the second part, witnesseth that the party of the first part for and in consideration of the covenants of the party of the second part hereinafter mentioned, agrees to pay the party of the second part the sum of eight hundred and seventy-five dollars ($875.00) in five equal payments of one hundred and seventy-five dollars each ($175.00), the first payment to be made this day, and the other four payments on the 1st day of June, 1898, 1899, 1900, 1901, respectively. In consideration of the promise of the foregoing payments the party of the second part hereby agrees not to run his ice machine as described above, nor suffer it to be run for the term of five years at Tuscaloosa, Ala., unless the party of the second part shall make a sale of the same to be run at Tuscaloosa, Ala., in which event he releases the party of the first part from making all subsequent payments to him; and also agrees to refund on any payment made by [to] him during the year such sale is made such a part of said payment as the remainder of that year bears to the entire year. It is further agreed that if the said party of the second part shall sell his ice plant between January 1st and June 1st of any year he shall be entitled to his proportional payment for that year. It is further

agreed that in case some unknown party should erect, or operate an ice machine in the city of Tuscaloosa, Ala., or in the vicinity of said city of Tuscaloosa, that the party of the second part, known in contract as B. H. Williams, shall release all subsequent payments to the party of the first part, at the time of the erection of an ice plant to compete with said first party, provided that the sum of $500 shall have been paid to the party of the second part. It is further agreed that if said plant or opposition should disturb the party of the first part before the amount of five hundred dollars is paid to the party of the second part, that the party of the first part shall only pay to the party of the second part the difference between the total payments made and the $500; and should said ice plant be erected after $500 had been paid to the party of the second part, no other payments will be required. And plaintiff says that although he has complied with all its provisions on his part, and has not sold his said ice machine to be operated at or in the vicinity of Tuscaloosa, the defendant has failed to comply with its provisions on its part in the particulars following, viz.: Some time during the summer of 1898, to-wit, in July or August, the Tuscaloosa Gas, Electric Light & Power Co., a corporation having its office and principal place of business at Tuscaloosa, Ala., amended its corporate charter, changing its name to 'The Tuscaloosa Light & Ice Company,' and having conferred upon it the power to manufacture and sell ice at Tuscaloosa, Ala., and erected an ice plant and began the manufacture of ice at Tuscaloosa, and although the defendant had at the time of the establishment of said Tuscaloosa Light & Ice Co.'s ice plant at Tuscaloosa, only paid to plaintiff the first payment of $175.00 mentioned in said contract as paid on the day of its execution, it has wholly failed and refused to pay plaintiff the difference between said payment of $175 and $500 as it agreed in said contract to do in the event of the erection of an opposition ice plant; hence this suit."

To this complaint the defendant interposed the following plea: "At the time said contract was entered

into, the plaintiff owned and operated the only ice fac-
tory in Tuscaloosa or its vicinity, and the only factory
which was then selling ice to the people of Tuscaloosa
and immediately surrounding territory, other than de-
fendant's factory. Said population consisting of, to-
wit, seven thousand people, was drawing its whole sup-
ply from and was dependent upon said two ice factories
for the same, and the demand for ice in said community
was sufficient to consume and render marketable the
output of both of said factories. Prior to said contract
the price of this article of necessity and comfort was
lessened to said community of consumers by competi-
tion between these two said ice factories. The object
and effect of said contract was to wholly discontinue
the manufacture of ice by plaintiff, to close down plain-
tiff's factory, to end all competition with defendant's
ice trade, to leave defendant's plant the sole source of
ice supply for said community, and to give to defendant
the complete control and monopoly of said ice market,
enabling it to increase the price thereof regardless of
the cost of its manufacture. Wherefore said contract
was one concerning said ice market, stifling competition,
creating monopoly, closing down heretofore active manu-
facture, and hence the same is void as in restraint of
trade and against public policy." The trial court sus-
tained a demurrer to the plea, defendant declined to
plead over and judgment was entered for plaintiff. The
present appeal from that judgment presents the ques-
tion of whether the contract sued on considered in con-
nection with the facts averred in the plea involves a
vicious restraint of trade and is therefore violative of
the public policy of the State, and void.

The argument in support of the contract is largely
based upon the considerations that the restraint it im-
poses is limited both as to time and to territory—to five
years at the most and to the town of Tuscaloosa and its
vicinity, and many cases have been determined upon
these considerations alone. But they were so deter-
mined, or at least at the present day they could be so
determined, only because the contracts involved in them
were unobjectionable upon other grounds. As the prin-

ciples obtaining here are understood in their application to existing conditions of traffic and commerce, we apprehend that circumstances in respect of a particular business might exist under which a covenant engaging in it covering all time and the whole country would be upheld by the courts. All such covenants are for the protection of the business of the covenantee; and the logical rule would seem to be that their scope may be as broad as to time and territory as the business intended to be protected. It is upon this principle that contracts not to engage at any time in particular businesses in the United Kingdom or in the United States, or even in Great Britain and Holland, or in the United States and Canada have been held valid, the business in each instance being co-extensive with the territory embraced in the covenant, and of probable indefinite continuance. And on the other hand, the same principle is potent to the conclusion that such covenant having reference to a particular county or even town only, and confined to a year or other definite time may be void in whole or in part for being broader as to time or place than the business designated to be protected by it, as where the business extends only to a part of the county or town, or must cease short of the time of the covenant. But however extended or circumscribed the business may be, however broad or narrow may be the covenant in respect of time and place, and however exactly the covenant may respond in time and place to exigencies of the business, the contract may yet fall under the ban of public policy and call for condemnation by the courts upon other and distinct considerations growing out, it would seem, of the nature of the transaction upon which it is based, or looking to the protection of the public from the strangulation of legitimate and necessary competition.

One of these considerations, that resting on the nature of the transaction in which the covenant not to engage in a particular business is made, is this: Leaving to one side and out of view those cases in which property is sold and as part of the consideration the vendee agrees not to employ it in a business being carried on by the vendor, or within the territory covered by the vendor's business, and that other class of cases in which

an employe covenants with his employer not to engage in the business about which he is employed on his own account or for another after the termination of his employment, and that yet other class of cases involving secret or patented processes, or patented devices and instrumentalities, it seems that the only cases, apart as we have indicated from those just mentioned, in which there can be any legitimate occasion for a covenant on the part of one not to engage in the business proposed to be carried on by another, are those in which the covenantor *has sold* to the covenantee his stock in trade, as in the case of a merchant, or his part of it, as where one mercantile partner sells out to the other or to a stranger, or, being a professional man with an established practice, as a physician, dentist and the like, or mechanic with a shop and accustomed patronage, as a blacksmith and the like, or, if he be a manufacturer, sells out his practice or business or plant, with or without an express stipulation as to its good will, and in the same transaction and as part of the thing sold and as in part the consideration for the price paid agrees not to engage in that business, profession or trade, as the case may be, within the territory covered or supplied by the business, practice or factory purchased during the time the vendee shall be interested therein. In line with this view it is said by Mr. Beach: "The modern doctrine is well nigh universal that when one engaged in any business or occupation sells out his stock in trade and good will or his professional practice, he may contract with the purchaser and bind himself not to engage in the same vocation in the same locality for a time named and he may be enjoined from violating this contract. This is about as far as contracts in restraint of trade have been upheld by the American courts or those of England. While the law, to a certain extent, tolerates contracts in restraint of trade or business when made between vendor and purchaser and will uphold them, it does not treat them with any special indulgence. They are intended to secure the purchaser of the good will of a trade or business a guaranty against the competition of a the former proprietor. When this object is accom-

plished it will not be presumed that more was intended."
2 Beach on Contracts, § 1575. And to the same effect
is the declaration of the Supreme Court of Illinois in
*Moore et. al. v. Bennett et. al*: "Contracts in partial re-
straint of trade which the law sustains are those which
are entered into by a vendor of a business and its good
will with his vendee, by which the vendor agrees not to
engage in the same business within a limited territory,
and the restraint to be valid must be no more extensive
than is reasonably necessary for the protection of the
vendee in the enjoyment of the business purchased,"
(140 Ill. 69, 80); and this language is quoted approv-
ingly by the Supreme Court of Pennsylvania.—*Nester et
al. v. Brewing Co., et. al.* 161 Pa. St. 473. The Supreme
Court of Iowa adopts the same view, *Chaplin v. Brown,*
12 L. A. R. 428; and so have other courts where this
phase of the general question has been discussed.—*Oli-
ver v. Gilmore,* 52 Fed. Rep. 562. There are several
reasons for upholding the covenant on the part of the
vendor in all such cases to desist from the business in
competition with the purchaser which do not obtain in
other cases. In the first place the restraint is partial in
the sense that it covers only the time and locality during
and in which the vendee carries on the business pur-
chased, and beyond these limitations the seller is at
liberty to carry on the same business. Then too the
vendor receives an equivalent for his partian abstention
from that business in the increased price paid him
for it on account of his covenant; and his entering into
and observance of the covenant not only does not tend
to his pauperization to the detriment of the public but,
to the contrary, by securing to him the full value of his
business and its good will, a value which he has an ab-
solute right to secure in this way, the covenant operates
to his affirmative pecuniary benefit and against his im-
poverishment, involving, the theory is, imminency of
his becoming a public charge or a criminal, in that
while being paid for desisting from the particular busi-
ness in the locality covered by it he may still enter upon
other pursuits of gain in the same locality or upon this
one in other localities. And finally, while such coven-
ants preclude the competition of the covenantor, it is

neither their purpose nor effect to stifle competition generally in the locality, nor to prevent it at all in a way or to an extent injurious to the public, for the business in the hands of the purchaser is carried on just as it was in the hands of the vendor, the former merely takes the place of the latter, the commodities of the trade are as open to the public as they were before, the same competition exists as existed before, there is the same employment furnished to others after as before, the profits of the business go as they did before to swell the sum of public wealth, the public has the same opportunities of purchasing, if it be a trading business, they are served in the same way, if it be a profession, and production is not lessened if it be a manufacturing plant. As said by PUTNAM, Circuit Judge, in *Oliver v. Gilmore,* (52 Fed. Rep. 568), "* * * When the covenantor surrenders his trade or profession an equivalent is given to the public, because ordinarily as a part of the transaction, the covenantee assumes and carries on the trade or profession, nothing is abandoned, and only a transfer is accomplished. The same occupation continues, the same number of mouths are fed." And these considerations obtain where one already engaged in a business in good faith for the purpose of enlarging and increasing his business purchases the stock, in trade or practice, or plant of a rival and incident thereto takes the covenant of the seller not to engage in the same business within the territory covered by the consolidated enterprise, and in all such cases the covenant in restraint of trade is a reasonable one and valid. But there is no room for the application of these reasons to cases in which the covenantee does not purchase the business, practice, trade or plant of the covenantor and the transaction involves nothing but a bald covenant in restraint of trade for which there is no other consideration than the payment of money for the obligation itself. In such cases the business of the covenantor is not transferred merely; it is destroyed. His plant is not continued by the covenantee in useful production, but is left to rust and canker in disuse. The public loses a wealth-producing instrumentality. Labor is thrown

out of employment; "the same number of mouths" are not fed. The consideration the covenantor receives is not the just reward for his skill and energy and enterprise in building up a business, but is a mere bribery and seduction of his industry and a pensioning of idleness. The motives actuating such a transaction are always in a sense sinister and baleful. Its purpose and effect are not to protect the covenantee in the legitimate use of something he has acquired from the covenantor, but to secure to him the illegitimate use or the use in an illegetimate way of that which he already has, in respect of which there is no reason or occasion for the covenantor to assume any obligation of protection. Such an undertaking in restraint of trade, however limited as to time and place, would seem upon all general principles, though we know of no case expressly and directly so deciding, to be necessarily unreasonable and vicious on the consideration alone that it is not entered into nor has it the effect of protecting some business, practice, trade or interest which the covenantor has sold to the covenantee. The undertaking involved in this case is precisely of that class, and must fail upon the principle we have been discussing.

But this contract is clearly bad upon the other consideration adverted to above: It tends to injure the public by stifling competition and creating a monopoly. Its manifest purposes even upon its face, and certainly when taken in connection with the facts averred in the plea, was to secure to the covenantee a monopoly in the production and sale of ice in the town of Tuscaloosa and vicinity, and such is its operation and effect. Indeed, on the allegations of the plea it was even worse than this for one of its results was to reduce the available supply of ice below the needs of the locality affected by it. It thus operated not only to put it in the power of the covenantee to arbitrarily fix prices, but directly and necessarily to create a partial ice famine upon which the defendant company could batten and fatten at its own sweet will. But aside from this, the monopoly itself, the putting in the power of the covenantee to control the production and to fix its own prices whatever the production is quite sufficient for the utter con-

demnation of the contract as being against public policy. The purpose to create a monopoly is obvious; it is well nigh expressed in the writing itself. That a monopoly was created is clear beyond all dispute. That ends the case against the validity of the covenant. Nothing more need be said. All that has been said for the appellee against that conclusion is vain and useless. Given the purpose and effect of this contract, its condemnation would follow even had the plaintiff as a part of the transaction sold his ice plant to the defendant; and the limitation of the covenant as to time and place, though reasonable in itself, is of no redeeming importance or efficacy whatever. So of the suggestion that no monopoly was created because the contract itself evidences a contemplation that "unknown parties" might come to Tuscaloosa, establish an ice factory and enter upon the production and sale of ice in competition with the covenantee: There was no other such plant there at the time the contract was entered into (it would not have been entered into at all had there been) and it is of no sort of consequence that another might be established, or even that another was in fact established soon after its execution, as soon probably as one could be established after defendant's monopoly begun to grind. Nor is there the least merit in the suggestion that ice could be brought to Tuscaloosa from other places, and hence that defendant had no monopoly. Even with ordinary commodities a covenant tending to create a monopoly in a given city or to unduly control prices is not relieved by the consideration that its baneful effects may be counteracted in greater or less degree by importations; and the position is exceedingly nude and bald when taken in respect of a commodity like ice or water, the chief cost of which, apart from the plant for its manufacture or collection, is in the transportation to the consumer; and it may be safely said that an ice factory in a town beyond the ordinary reach of delivery wagons from another town has a monopoly of the ice business in that town. And so of the argument that public policy has to do in this connection only with the necessaries of life and that ice is not a

commodity of that class.   Both the propositions thus
asserted, the one of law, the other of fact, are unsound.
To say the least it is against public policy to monopolize
in this way any commodity of common utility, or of
common consumption or use among the people, or even
of considerable utility or consumption, whether it be one
of the necessaries of life or not; and in the second place,
we feel entirely assured of conservatism in declaring
that in this latitude, and especially in towns as popu-
lous as Tuscaloosa, ice is one of the common necessaries
of life.   All of the foregoing propositions, sustaining
the conclusion that the contract sued on is violative of
public policy as stifling competition and promoting
monopoly to the manifest injury of the public, are fully
supported by the following authorities: 2 Beach Mod-
ern Law of Contracts, §§ 1579, 1592; Clark on Con-
tracts, pp. 458 et seq.; Craft v. McConoughby, 79 Ill.
346; Arnot v. Coal Co., 68 N. Y. 558; Moore v. Bennett,
140 Ill. 69; Santa Clara Co. v. Hays, 76 Cal. 387; Hook-
er v. Vandewater, 4 Denio. 349; Stanton v. Allen, 5
Denio 434; Salt Co. v. Guthrie, 35 Ohio St. 666; Bag-
ging Co. v. Koch, 14 La. Ann. 168; Oil Co. v. Adone, 83
Tex. 650; Morris Run Coal Co. v. Bardey, 68 Pa. St.
173; Chaplin v. Brown, 12 L. R. A. 428; Oliver v. Gil-
more, 52 Fed. Rep. 562; Nestor v. Brewing Co., 161 Pa.
St. 473; Anderson v. Jett, 89 Ky. 376.

It follows that in our opinion the court below erred
in sustaining the demurrer to defendant's plea.   The
judgment of the Law and Equity Court will be re-
versed, and a judgment will be here entered overruling
said demurrer.   The cause will be remanded.

Reversed, rendered in part, and remanded.