[Georgia Fruit Exchange v. Turnipseed.]

# Georgia Fruit Exchange *v*. Turnipseed.

## *Assumpsit.*

(Decided May 13, 1913.  62 South. 544.)

1. *Contracts; Validity; Violation of Positive Law.*—Agreements in violation of positive law are those which are expressly or impliedly prohibited, either by some rule of common law, or by some express statutory provision, and to such the courts refuse recognition and enforcement.

2. *Same; Public Policy.*—An agreement in violation of positive law is necessarily contrary to that part of public policy expressed in the particular rule or statute violated.

3. *Same.*—Public policy is broader than the mere terms of the statute or statutes, and embraces not only their letter, but their general purpose and spirit as well; it is that principle of law which holds that no person can lawfully do that which has a tendency to be injurious to the public, or against the public good as ascertained or measured by the settled policy of the state or government, as evidenced in its constitutions, statutes and judicial declarations. An executory contract of this character or belonging to this class will be declared void, although in the particular instance no injury to the public has resulted, and no positive statute is violated.

4. *Same; Restraint of Trade.*—Agreements in reasonable restraint of trade are valid, but agreements in unreasonable restraint of trade are contrary to public policy and void, because they tend to the creation of a monopoly.

5. *Same; Test.*—The test by which to determine whether a contract is in reasonable or unreasonable restraint of trade is whether it merely affords fair protection to the interest of the party in whose favor it is made without being so large in its operations as to interfere with the interests of the public.

6. *Same; Sale of Goods; Commission Merchant.*—A unilateral contract such as is set out in count 5 of the complaint in this cause is an agreement or combination to place the sale of the crop in the hands of the exchange to avoid competition among growers and purchasers, and thereby to raise the price of the fruit, and regardless of the degree of public injury, and therefore void as a contract in restraint of trade, and against public policy.

7. *Same; Parties; Unilateral.*—A contract between a fruit exchange and a grower, signed only by the grower and becoming a contact as the result of its acceptance by the exchange is in form unilateral.

8. *Monopolies; Grant; Common Law.*—At common law a monopoly was an exclusive right granted by the crown to a person or class of persons of something which was before the grant a com-

mon right, and which enabled the grantee to exclude others therefrom; but even without such a grant, combined action or individual initiative on the part of private parties to obtain the exclusive power to carry on a certain trade or business, and attempts to gain control of the market by forestalling regrating or engrossing were unlawful.

9. *Same; Nature and Validity.*—Monopolies were odious at the common law not only as being in contravention of common rights, but as founded in the destruction of trade by the extinguishment of free and healthy competition, as they have three inseparable results, to raise the price of the commodity dealt in, to cause the commodity to be less good and merchantable than formerly, and tending to the impoverishment of those excluded from such business; therefore, in their nature, they are opposed to the principles of a republican form of government, and require neither expressed statutes, nor constitutional prohibition to render them illegal.

10. *Same; Trusts and Combines.*—As now understood, the term "monopoly" includes any combination, the tendency of which is to prevent competition in its broad and general sense, and to control prices to the detriment of the public; a trust is a contract, combination or understanding, express or implied, between two or more persons to control the price of a commodity, or service for the benefit of the parties thereto, and to the injury of the public, and which tends to create a monopoly; and a pool is an organization of persons or corporations formed primarily for the purpose of regulating the supply and the price of a commodity.

APPEAL from Bullock Circuit Court.

Heard before Hon. M. SOLLIE.

Action by the Georgia Fruit Exchange against D. C. Turnipseed for breach of contract. Judgment for defendant, and plaintiff appeals. Affirmed.

Count 5 is as follows: "The plaintiff, a foreign corporation, organized under the laws of the state of Georgia, and having its principal place of business in Atlanta in said state, the business of said corporation being that of a fruit and vegetable exchange for handling, distributing, and marketing in America and foreign markets of peaches and other fruits, melons, and vegetables of all descriptions for the peach, fruit, and vegetable growers of Georgia and other states, claims of the defendant the sum of $1,000 for the breach of an agreement entered into by him with the plaintiff at Penrode in the state of Alabama, in words and

figures as follows: 'Penrode, Ala., March 10, 1909. In consideration of the benefits I expect to receive in common with all other fruit growers in Georgia by the organization of the Georgia Fruit Exchange, I hereby subscribe for membership and stock therein, and I hereby pledge to the Georgia Fruit Exchange, as follows: First, I agree to make all car load shipments of peaches grown by me during 1909, through the Georgia Fruit Exchange and pay 10 percent. of gross sales to cover all commission charges,. remittance to be made by commission house direct to shipper, and the shipper reserving the right to designate by April 1 of each year the commission house in each market to which his consignments have been allotted. On orchard and other sales f. o. b. my station in consideration of a protected market and consequent enhanced price, I agree to pay the exchange 5 per cent. of such gross sales, and I further agree to abide by all the rules and regulations of the board of trustees of said exchange. Second, I hereby subscribe for and I agree to pay for on a basis of 10 per cent. Nov. 1, 1908, and 10 per cent. monthly thereafter on shares at $10 each of the stock of the Georgia Fruit Exchange aggregating $10. This agreement is not binding until $50,000 of stock is subscribed, and pledges secured covering 60 per cent of the prospective crop for 1909, based on 1908 shipments. D. C. Turnipseed.' And plaintiff avers that prior to the breaching of the said agreement herein set out, $50,000 of stock was subscribed, and pledges secured covering 60 per cent. of the prospective crop for 1909, based on the 1908 shipments, and plaintiff avers that the said agreement was breached by the defendant in this: That he shipped, to wit, 31 car loads of peaches, grown by him in 1909, which were orchard and other sales made by him f. o. b. his station independent of the Georgia Fruit

Exchange, and that 5 per cent. of the gross sales of said 31 car loads which he had agreed to pay to plaintiff amounted to $1,000, and which sum, with the interest thereon, under said contract and agreement is due to plaintiff, and that prior to the bringing of this suit the plaintiff demanded that sum from defendant, but he refused to pay the same, wherefore, this suit; and the plaintiff admits that at the time the said agreement was signed by the defendant, it had not filed an instrument in writing under the seal of said corporation and signed officially by its president and secretary designating at least one known place of business in this state, and authorized agent or agents thereat in the office of the Secretary of this State."

NORMAN & SON, and WATKINS & LATIMER, for appellant. The real questions presented for review were embraced in assignments of demurrer 4, 5, 15, 16, 17, 18 and 19, as addressed to the amended complaint. It must be borne in mind that our constitutional and statutory provisions are not intended to interfere with acts of interstate commerce.—*Ware v. Hamilton-Browne,* 92 Ala. 145. The contract in question was an incident to interstate commerce, and not within the inhibition of the statute.—*Abrams v. So. Ry.,* 149 Ala. 547; *Bear v. H. & A. Pub. Co.,* 71 Ala. 60; 205 U. S. 530; 8 Ann. cases, 941; 156 Fed. 196. These authorities also sustain the proposition that the acts of the exchange were not the doing of business, or exercise of its corporate functions within the state. Certainly the institution of a suit does not constitute the doing of business.— *Woodall v. Peoples Nat. Bank,* 45 South. 194; 2 Alaska 344; 95 Pac. 404; 83 Pac. 734; 147 Fed. 885; 92 S. W. 1046. The agreement to ship peaches was not the doing of business in this state.—103 N. Y. Supp. 243;

122 Pa. St. 48; 121 Mo. App. 688. There is nothing within the four corners of the contract in any way indicating that the contract is illegal as against the public policy of the state, nor is there anything in the contract making it one in restraint of trade.—171 U. S. 578; 125 U. S. 288; 148 U. S. 212; 37 Fed. 567; 171 U. S. 604. Neither is the contract a violation of the Sherman anti-trust act.—179 Fed. 183 Fed. 427.

RAY RUSHTON, W. M. WILLIAMS, and L. M. MOSELEY, for appellee. The contract is an Alabama contract for the exercise of the corporate functions of the appellant, a foreign corporation in the state of Alabama, and is therefore void.—Sec. 232 Const. 1901; Sec. 3642, 3644, 3653, Code 1907; *Dooley v. Collier*, 87 Ala. 431; *Boulden v. Estey Organ Co.*, 92 Ala. 182; *Farrior v. N. E. M. Co.*, 88 Ala. 278. The contract is also in contravention of the public policy and anti-monopoly laws of the state of Alabama.—Sec. 7579, Code 1907. While the contract is not interstate commerce, it is in undue restraint upon interstate commerce, and therefore violative of the Sherman anti-trust law.—10 L. R. A. (N. S.) 268; 46 L. R. A. 122; 7 Bing. 735. These things all appearing on the face of the complaint, were properly raised by demurrer.

THOMAS, J.—The reporter will set out count No. 5 of the complaint, which contains a copy of the contract sued on and a statement in full of plaintiff's case. Demurrers were interposed to the count, assigning numerous grounds, but were sustained by the trial court upon only two of such grounds, which, in substance, may be stated as follows: First. That the count shows on its face that plaintiff is a nonresident corporation and was engaged in business in this state as to the

matters upon which it predicated its right of recovery in the case; but the count fails to show or allege that, before engaging in such business, the plaintiff had complied with the Constitution (section 232) and statutes of this state in aid thereof (Code, § 3642), requiring, under penalty, the filing by such corporation, in the office of the Secretary of State, of an instrument in writing, etc. Second. That the count shows on its face that the contract sued upon and set out therein is illegal and void as in restraint of trade and against public policy. Upon the sustaining of these grounds of the demurrer it became necessary for plaintiff to take a nonsuit, which it did, bringing now here for review, under the authority of section 3017 of the Code, only the action of the trial court in the particular named.

Since we are of the opinion that the second of the two named grounds of the demurrer is good, it becomes unnecessary to consider, and we therefore pass over, the first ground, confining our attention exclusively to the second, a decision upon which will sustain the lower court and completely dispose of the case.

Unlawful agreements—that is, those whose objects are illegal, and to which the courts refuse recognition and enforcement—may be placed in two classes, viz. (1) agreements in violation of positive law, and (2) agreements contrary to public policy. Agreements in violation of positive law are those which are expressly or impliedly prohibited, either by some rule of the common law or by some express statutory provision, and which, of course, also necessarily amount to agreements contrary to that part of the public policy expressed in the particular rule or statute violated.—9 Cyc. 466.

Public policy, however, is broader than the mere terms of the Constitution and statutes and embraces their general purpose and spirit. Constitutions are

[Georgia Fruit Exchange v. Turnipseed.]

born of the people, and statutes made (including the positive rules of common law adopted) in pursuance thereof emanate, of course, from legislative sources, all designated for the public good; but, where they are silent in terms and do not of their own force vitiate contracts detrimental to the public interest or welfare, as may be outlined in, and as is to be determined alone from, a general view of such Constitution and statutes, the courts have supplied in a way the deficiencies of positive law by originating the doctrine of "public policy" and so applying it as to hold void and decline to enforce executory contracts which, though not violating the terms, yet violate the general purpose, spirit, and policy of the law as expressed in the Constitution and statutes. The latter, of course, constitute the standards, changing with the habits, customs, and ideals of the people, by which the courts are to and do determine, in the light of judicial precedents, the public policy of a state or nation.—*People v. Hawkins,* 157 N. Y. 1, 51 N. E. 257, 42 L. R. A. 490, 68 Am. St. Rep. 736; *Couch v. Hutchinson,* 2 Ala. App. 447, 57 South. 75; *U. S. v. Trans-Mo. Freight Ass'n,* 58 Fed. 58, 7 C. C. A. 15, 24 L. R. A. 73; Words & Phrases, vol. 6, 5815. Combining and paraphrasing definitions given by others, it is therefore perhaps correct to say that public policy is that principle of law which holds that no person can lawfully do that which has a tendency to be injurious to the public or against the public good, as ascertained from and measured by the settled policy of the state or government to be found in its Constitution, laws, and judical decisions.—Authorities supra. Where a contract belongs to this class it will be declared void, although in the particular instance no injury to the public may have resulted, and no positive statute be violated.—*Fireman Char. Ass'n v. Berghaus,* 13 La.

Ann. 209; 2 May. Dig. 784; 6 May. Dig. 182-184; 5 May. Dig. 218.

It is settled that, while agreements in reasonable restraint of trade are valid, yet contracts or agreements in unreasonable restraint of trade are contrary to public policy and void, because they tend to the creation of a monopoly.—9 Cys. 533; 27 Cyc. 891; *Arnold v. Jones,* 152 Ala. 506, 44 South. 662, 12 L. A. R. (N. S.) 150; *Tuscaloosa Ice Mfg. Co. v. Williams,* 127 Ala. 110, 28 South. 669, 50 L. R. A. 175, 85 Am. St. Rep. 125; *Fullington v. Kyle Lumber Co.,* 139 Ala. 242, 35 South. 852; 2 May. Dig. 784; 5 May. Dig. 218; 6 May. Dig. 182; *U. S. v. Trans-Mo. Freight Ass'n,* 58 Fed. 58, 7 C. C. A. 15, 24 L. R. A. 73.

A monopoly, as understood at common law, was an exclusive right granted by the crown to one person, or a class of persons, of something which before was of common right, and which enabled the persons who possessed it to exclude others from the defined activities. —*B. Ry. Co. v. Birmingham St. Ry. Co.,* 79 Ala. 471, 58 Am. Rep. 615. Without such a grant even then, the obtaining by combined action or individual initiative on the part of private parties of the exclusive power to carry on a certain trade or business, etc., and all attempts to gain control of the market by forestalling, regrating, or engrossing were unlawful and punishable. —27 Cyc. 890. Ala. Political Code, p. 30, note. At a later time, during the reign of James I, there was passed an act of Parliament which by a general sweeping clause demolished all existing monopolies, with certain exceptions, which had been before created by the crown, and declared them also to be contrary to law and void. —Status of Monopolies, 21 James I.

Monopolies were deemed odious at common law, not only as being in contravention of common right, but

as founded in the destruction of trade by the extinguish-
ment of free and healthy competition. They have, as
was said in the old English case of The Monopolies,
11 Code, 84, three inseparable incidents, each detriment-
al to the public good: (1) The price of the commodity
dealt in will be raised, for he who has the sole selling
of any commodity may and will make the price as he·
pleases; (2) the commodity will not be as good and
merchantable as before, for the beneficiary regards his
private interest, and not that of the commonwealth;
(3) it tends to the impoverishment of those that are ex-
cluded from or driven out of the business.

Monopolies in their very nature are opposed to the
genius and principles of a Republican form of govern-
ment, and require neither express statutes nor constitu-
tional prohibitions to make them illegal.—*Bir. & P. Ry.
Co. v. Bir. St. Ry. Co.,* 79 Ala. 465, 58 Am. Rep. 615.
The inadequacy, however, of common-law remedies and
common-law punishments for the purpose of dealing
properly with modern trusts and monopolies, which in
recent decades have multiplied freely, has led Congress
and the Legislature of many of the states  to  enact
drastic statutes against all trusts, pools, and unlawful
combinations designed to restrain trade and prevent
competition, with a view to the destruction of existing
ones and the prevention of future ones by punishing
their authors positively as well as still punishing them
negatively by denying them the aid of the courts in
enforcing their contracts.

Section 23 of our Constitution forbids the granting ·
of exclusive and irrevocable special privileges and im-
munities by the Legislature, and section 103 thereof,
which is a provision new to the Constitution of 1901,.
enjoins positively upon the Legislature the duty of pro-
viding by law for the "regulation, prohibition, or rea-

sonable restraint of common carriers, partnerships, associations, trusts, monopolies, and combinations of capital, so as to prevent them or any of them from making scarce articles of necessity, or increasing unreasonably the costs thereof to the consumer, or preventing reasonable competition in any trade, calling or business." In pursuance of this latter provision the Legislature of this state, following the lead of other states, has passed the act now embraced in sections 7579, 7580, and 7581 of the Code, patterned after a similar statute in Illinois and other states and akin to the federal statute, known as the Sherman Anti-Trust Act of July 2, 1890, c. 647, 26 Stat. 209 (U. S. Comp. St. 1901, p. 3200).

Said section 7579 of our Code thus provides: "Any person or corporation who engages or agrees with other persons or corporations, or enters into, directly or indirectly, any combination, pool, or trust, or confederation to regulate or fix the price of any article or commodity to be sold or produced within this state, or * * * must, on conviction, be fined," etc.

Section 7581 reads: "Any person or corporation, domestic or foreign, which shall restrain or attempt to restrain the freedom of trade or production, or which shall monopolize or attempt to monopolize the production, control or sale of any commodity, or * * * shall be fined," etc.

The Sherman Anti-Trust Act makes illegal, punishing the parties thereto by fine or imprisonment, "every contract, combination in the form of a trust or otherwise, or conspiracy, in restraint of trade or commerce among the several states or with foreign nations," etc.

There being thus both a state and national law prohibiting unlawful combinations in restraint of trade— the one law relating to intrastate, the other to interstate, commerce—it is immaterial as to which character

of commerce, whether only one or both, is involved in
the contract here under consideration; for if the con-
tract is in violation of either law it is void as contra-
vening a positive statute; and, even if it does not go to
the extent of being in actual violation of either statute,
yet if it tends to create a monopoly by unreasonably
restraining trade, it is still void under our law, as at
common law, as being against public policy.—*Arnold
v. Jones,* 152 Ala. 505, 44 South. 662, 12 L. R. A. (N.
S.) 150; 2 May. Dig. 784; 5 May. Dig. 218; 6 May.
Dig. 182, where the authorities are cited.

The test which is laid down for determining whether
a contract is in reasonable or unreasonable restraint of
trade is:  Does it merely afford a fair protection to the
interest of the party in whose favor it is made, with-
out being so large in its operation as to interfere with
the interest of the public?—*McCurry v. Gibson,* 108 Ala.
453, 18 South. 806, 54 Am. St. Rep. 177.  Dealing more
fully with this latter proposition, it is well said by the
United States Circuit Court of Appeals, after review-
ing the authorities, speaking through Sanborn, J.:  "It
clearly appears that when the Anti-Trust Act was pass-
ed the rule had been firmly established in the jurispru-
dence of England and the United States that the valid-
ity of contracts restricting competition was to be de-
termined by the reasonableness of the restriction.  *If
the main purpose or natural and inevitable* effect of
a contract was to suppress competition or create a mo-
nopoly, it was illegal.  If the contract imposed a re-
striction that was unreasonably injurious to the public,
or a restriction that was greater than the interest of
the party in whose favor it was imposed demanded, it
was illegal.  But contracts made for a lawful purpose,
which were not unreasonably injurious to the public
welfare, and which imposed no heavier restraint upon

[Georgia Fruit Exchange v. Turnipseed.]

trade than the interest of the favored party required, had been uniformly sustained, notwithstanding their tendency, to some extent, to check competition. The public welfare was first considered, and the reasonableness of the restriction determined under these rules in the light of all the facts and circumstances of each particular case.—*U. S. v. Trans-Mo. Freight Ass'n*, 58 Fed. 58, 7 C. C. A. 15, 24 L. R. A. 84.

From Am. & Eng. Ency. Law we cull the following definitions, drawn by it from the decisions of the various courts, to wit: "While a monopoly, in its strict sense, is an exclusive right, granted by the state to a few, of something which was before of common right, yet the term, as now understood, is not confined to such narrow limits, but embraces any combination the tendency of which is to prevent competition in its broad and general sense and control prices to the detriment of the public. A trust is a contract, combination, confederation, or understanding, express or implied, between two or more persons to control the price of a commodity or service, for the benefit of the parties thereto, and to the injury of the public, and which tends to create a monopoly."—20 Am. & Eng. Ency Law, p. 846, citing the authorities. "A pool is defined as an organization of persons or corporations formed mainly for the purpose of regulating the supply and price of commodities."—22 Am. & Eng. Ency. Law, p. 942, citing authorities. See also Words & Phrases, under appropriate titles on these subjects.

With these principles and definitions in mind, we will undertake an analysis of the contract here presented by dividing it into its component parts as to the things done and the things agreed in it to be done, and consider each separately and then the contract as a whole,

to the end of ascertaining if it falls within the prohibited class.

The contract, as will be observed, is unilateral in form, being signed only by the defendant, and became a contract alone as the result of plaintiff's acceptance of it, which presumably was done at the place at which it was signed by defendant—Penrode, Ala.—as its nature and form are such as to suggest that the defendant's signature thereto was procured either through the solicitation and instrumentality of a traveling agent sent by plaintiff, armed in advance with the contract, to see defendant, which is most probable, or by the plaintiff's mailing from its headquarters in Atlanta to the defendant at Penrode, Ala., the contract for signature and return. It expressly binds the defendant to do certain specific things therein enumerated, to wit: First. To take and pay for one share of stock of the plaintiff corporation of the value of $10, payable 10 percent. monthly. Second. To make all car load shipments of peaches, grown by defendant, through plaintiff corporation, and pay 10 per cent. of the gross sales thereof as total commission charges for handling and selling same, to be divided, we infer, between plaintiff and the sales broker or commission merchant at the market to which plaintiff might direct defendant to make the shipment, and in such proportion as plaintiff and said broker might agree. Third. To pay plaintiff a commission of 5 per cent. of the gross sales on all orchard and other sales f. o. b. defendant's railroad station, which we construe to mean such a commission on all sales made by defendant to purchasers of the fruit on the trees and all such other sales as were made by defendant, but not through plaintiff, as required in section 2, hereinbefore enumerated. These several promises to plaintiff on defendant's part were conditional, however, and were

not to become binding on him unless and until the plaintiff procured further subscriptions to its capital stock, which with plaintiff's would amount to $50,000, and secured from other fruit growers contracts or pledges, like that of defendant, sufficient with his to amount to a pledge to plaintiff, for purposes of sale, of at least 60 per cent. of the prospective crop for 1909, based on 1908 shipments. All other obligations assumed by plaintiff in the acceptance by it of the contract are left entirely to inference; but it cannot be doubted that, among them, plaintiff bound itself, of course, to issue and deliver to defendant, when paid for, the share of stock for which he subscribed in the contract; and to use its (plaintiff's) best efforts in finding a desirable market for and handling advantageously to defendant's interest the car loads of fruit that defendant bound itself under the contract to ship and dispose of through plaintiff.

For the share of stock the defendant, as seen, was to pay plaintiff $10, its full value, as stated in the contract, and for plaintiff's services and those of its agents, the commission merchants, in handling and selling the car loads of fruit shipped through plaintiff, the defendant was to pay a total commission of 10 per cent. which apparently is an adequate quid pro quo in return for the service named. What consideration, then, was there moving defendant to agree to pay plaintiff 5 per cent. of the gross sales of all peaches not shipped or sold through plaintiff, and with reference to which disposition plaintiff performed no service, or for which commission he was to give no consideration in return? Could not the defendant ordinarily buy stock in most any corporation, either from the corporation itself or some of its shareholders, by paying its full market value, and without the necessity of promising to give in addi-

tion at least 5 per cent. of the gross sales of his crop of peaches forever thereafter; and could not the defendant employ a broker or commission merchant for 10 per cent. commissions to handle and sell all car loads of peaches he might see fit to ship through him, without promising, in addition, to pay such broker or commission merchant a commission of 5 per cent. on all sales of such fruit not made through him, and to do so forever? It would be at least reasonable to suppose, looking alone to the information gained from the contract, that he could. Naturally, then, some consideration, other than a mere desire on defendant's part to own a share of stock in plaintiff corporation, and a mere desire to have such corporation handle, like any others might, his fruit crop, moved defendant to or actuated him in the execution of this contract with plaintiff, whereby he not only promised to pay it the stated value of such share of stock and the apparent value of the service for handling the cars of fruit he might actually ship through it, but also promised to pay it said commission of 5 per cent. on all fruit sold by him, or by others for him, and with respect to which plaintiff performed no service whatever. By this provision, defendant was bound, even if he sold his own fruit, to pay plaintiff 5 per cent. and if he procured another, other than plaintiff, to sell it for him, although he should have to pay that other the regular commission of 10 per cent., he would still have to pay plaintiff an additional 5 per cent. What was the consideration? We are not left to speculation or doubt, since the contract by its own plain and unambiguous terms informs us. It states (quoting) that "in *consideration of a protected market and consequent enhanced price,*" the 5 per cent. commission was promised.

How is the market to be protected and why the enhanced price? It cannot fairly be doubted but what the parties to the contract contemplated that this expected protected market and resultant enhanced price was to come only as a consequence of plaintiff's success in subsequently procuring or securing other peach growers, in such number as with defendant would amount to the producers of at least 60 per cent. of the peach crop, to do as defendant had agreed conditionally to do—become a member of plaintiff corporation by subscribing to its capital stock, and pledge plaintiff the absolute right to handle their fruit crop for a total commission of 10 per cent., and pay 5 per cent. to plaintiff on the gross sales of all fruit they did not let it handle—as a penalty, we infer, for not doing so, and agree to be bound by all the rules and regulations (present and future, we infer) of plaintiff's board of trustees, and that, too, without any limitation of time for the duration of the contracts. Presumably, it was to be a permanent arrangement by all these peachgrowing stockholders for the future sale and disposition of their crops, 60 per cent. of the whole, with a view of drawing into the association later the remaining 40 per cent., if possible.

The conclusion cannot be escaped that when plaintiff succeeded in getting said required number of peach growers, inclusive of defendant, each to become a member of its corporation or exchange and to execute a contract like that here under consideration, which plaintiff alleges it did do as the necessary averment of the performance by it of a condition precedent to its right to maintain an action on this contract, which, as seen, is so conditioned as not to be binding on defendant until plaintiff did do this—that is, did get *at least* 60 per cent. of the fruit growers into the association—plain-

tiff thereby became master of the situation, so far as re-
garded the sale and disposition of at least 60 per cent.
of the peach crop of the country, at least, of this sec-
tion of the country, and would remain such master so
long as the parties, defendant and the other required
number of growers, kept their contracts with plaintiff
to market their crop through it, and to abide by the
rules and regulations, not disclosed, of plaintiff's board
of directors.    To enforce the keeping of these contracts
to ship and sell through plaintiff, a penalty of 5 per
cent. we construe it, as said, was provided, which de-
fendant and the other required number of growers were
to pay plaintiff on any of their crop they might sell
themselves or employ others to sell for them, thus re-
sulting, after the making of these contracts, that these
growers would have to pay 5 per cent. for something
which cost them nothing before (that is, to sell their
crop themselves), and 15 per cent. for something which
cost them probably only 10 per cent. before (that is,
to have somebody else, other than plaintiff, to sell their
crop for them).    If after the making of the contract
they got others to sell their crop, they would, of course,
have to pay those others the regular commission of 10
per cent., and also 5 per cent. to plaintiff—whereas, if
they had plaintiff to sell for them, it would cost only
10 per cent.   We cannot doubt that the purpose of all
this was to force a selling through the plaintiff, and
thereby enable it to control the disposition and sale of
60 per cent. of the peach crop, and a larger proportion
if plaintiff could get other growers into its association;
the design evidently being to get all of them into the
arrangements if possible.    Assuming, however, that
plaintiff never got more than 60 per cent., of the grow-
ers—the minimum number required to make the con-
tracts with defendant and the other growers binding—

it gave plaintiff a commanding position in fixing the prices of peaches in this section of the country. It could direct the market to which any shipment was to go, and withhold from any market all shipments, or limit the supply at a particular market, thus forcing up the price. It is clear that the real design was to stifle and destroy at the various markets competition between defendant and the other growers, who became members of the plaintiff association, by allowing plaintiff to divert the crop from the channels of trade in which it would have ordinarily flowed if each grower had been left to act independently and to choose his own market, and to so direct the shipment of these several growers as to avoid competition between them at markets where they before competed.

Looking at the substance and not the form of these several contracts between plaintiff on one side and these 60 per cent. of the peach growers on the other, who thereby became members of plaintiff association, it amounts to nothing more nor less than an agreement or combination between them to place the disposition and sale of their crop each year in the hands of a joint agent, plaintiff, for the purpose of avoiding, as far as possible, competition among themselves, and thereby to raise the price of their products, and with the evident design and intent on their part and that of plaintiff, plainly contemplated in the contract, to get as many other growers into the arrangement as possible; it being both to their interest and to that of plaintiff, whose commissions would thereby be more, to do so.

In the case of *Ford v. Chicago Milk Shippers Ass'n*, 155 Ill. 166, 39 N. E. 651, 27 L. R. A. 298, the court, dealing with a state statute almost identical with ours and a state of facts similar in many vital respects to that here, though stronger there, said: "Appellee," the

Chicago Milk Shippers Association, a corporation, "receives milk from members and accounts to them for the same; guarantees to members payment for milk sold by it; fixes and determines the price of milk; retains five cents upon each can of milk sold for each year; has authority over all milk consigned by any of its members to any stand within the corporate limits of the city of Chicago"; and requires that "a member cannot sell his stock except to a shipper and producer of milk, and must own as many shares as he ships cans of milk per day," not to exceed, however, "50 shares" of stock. That the object of the association is to control the price of, and the purchase and sale of milk to retail dealers within the limits of the city of Chicago is clearly apparent, and this object is carried out by the concurrent action of the members of the association— by the action of the association on the one part, aided by the agreement of its members who, assenting to the constitution and by-laws, carry out a scheme which is a combination, agreement, or trust by which they fix the price of an article of merchandise and limit the quantity to be sold within the corporate limits of the city of Chicago. * * * The purposes attempted to be accomplished through the corporation were illegal. To carry out such purpose it [the association] stands as the active business agent of the members, who are stockholders, contracting with it to carry out the purposes of the organization. It is a combination in violation of the statute and in restraint of trade. * * * The corporation, as an entity, may not be able to create a trust or combination with itself, but its individual shareholders may, in controlling it, together with it, create [between them] such trust or combination that will constitute it with them alike guilty."

It is not necessary to the invalidity of the contract here and to the disposition of the present case to decide whether the contract is in violation of the state statute or of the federal statute, or any statute at all. We are not dealing with a criminal prosecution, and need not therefore concern ourselves with the question as to whether the commerce involved in the contract is inter or intra state, or both, or whether the terms of either statute have been violated. It is sufficient, as before seen, to destroy it and all obligations created by it, if it violates the public policy of the state or nation, as declared in judicial decisions predicated upon the principles of the common law obtaining here. It does contravene such public policy if it unreasonably restrains trade, because in such event it tends to create a monopoly, which is odious to our law and detrimental to public good, which requires freedom of trade and competition—"the life of a people's prosperity."—*Bir. & Pratt Ry. Co. v. Bir St. Ry. Co.,* 79 Ala. supra.

This contract, and the like ones made by plaintiff with the other peach growers as the performance of a condition necessary to the life of this one, stifles and destroys, as seen, competition between at least 60 per cent. of the peach growers in the sale of their products, was designed for the purpose of enhancing prices, and contemplated the getting of as many other growers into the combination as plaintiff might be able to. The restraint upon trade is, of course, not so farreaching and the ability to fix prices not so commanding as it would have been had all the peach growers, instead of 60 per cent., signed such contracts with plaintiff and become members of its exchange; but, so far as this restraint and ability goes, it is of precisely the same character and produces the same class of results, and is subject to the same legal objection. Courts will not

[Globe Tailoring Company v. Seibold.]

stop to inquire as to the degree of public injury when the main purpose or natural and inevitable effect of a contract is to suppress competition. "If its object is to prevent * * * ˙free and fair competition in trade, and may in fact have that tendency, it is void as being against public policy."—*Arnold v. Jones*, 152 Ala. 504, 505, 44 South. 662, 663 (12 L. R. A. [N. S.] 150) ; *McCurry v. Gibson*, 108 Ala. 453, 18 South. 806, 54 Am. St. Rep. 177 ; May. Dig. Supra ; *U. S. v. Trans-Mo. Freight Ass'n*, 58 Fed. 58, 7 C. C. A. 15, 24 L. R. A. 84 ; 27 Cyc. 899, 901 ; 9 Cyc. 423 ; 20 Am. & Eng. Ency. Law, p. 846 ; 24 Am. & Eng. Ency. Law, p. 854.

That such is the object and tendency of the present contract seems to us clear, and the judgment of the lower court is therefore affirmed.

Affirmed.