The ALABAMA GREAT SOUTHERN RAILROAD COMPANY, a Corporation, Plaintiff,

v.

LOUISVILLE AND NASHVILLE RAILROAD COMPANY, a Corporation, Defendant.

Civ. No. 6957.

United States District Court, N. D. Alabama, S. D.

Jan. 3, 1955.

Jos. F. Johnston and Leigh M. Clark, Cabaniss & Johnston, Birmingham, Ala., Sidney S. Alderman and Henry L. Walker, Washington, D. C., for plaintiff.

R. E. Steiner, Jr., Montgomery, Ala., Chas. H. Eyster, Decatur, Ala., White E. Gibson, Birmingham, Ala., and J. H. McChord, Louisville, Ky., for defendant.

LYNNE, Chief Judge.

On November 25, 1951, defendant's railroad train, the Crescent, normally running between Montgomery and New Orleans over its own rails, was proceeding southbound at Woodstock, Alabama, over the plaintiff's tracks, due to a detour caused by a damaged trestle on defendant's line. The detour was made under an arrangement ruled by a written Detour Agreement between the parties. Such train was being operated by plaintiff's employees, and defendant had only one employee thereon, who was there solely for the purpose of keeping a record of the tickets for interline accounting. Plaintiff's northbound train, the Southerner, entered the main line from a passing track, in violation of orders and signals, and a catastrophic, head-on collision ensued.

The collision occurred about 2:35 p. m., approximately three-fifths of a mile north of the small station of Woodstock, on plaintiff's single track line of railroad. Approaching Woodstock the track runs generally in a north-south direction. At Woodstock a siding 1.62 miles long parallels the main track. Certain changes were made in plaintiff's operation of this section of its railroad effective October 10, 1951, about six weeks prior to the accident. On September 24, 1951, plaintiff issued a bulletin addressed "To All Concerned" announcing that changes would be made in train operations, signals and interlockings on this section. Paragraph 1 of that bulletin notified plaintiff's employees that a centralized traffic control system would be placed in service. Paragraph 2 thereof notified that trains or engines would be governed by block and interlocking signals, whose indications would supersede the superiority of trains for both opposing and following movements on the same track. Paragraph 4 stated that interlocking switches and color light signals would be placed in service at Woodstock at the north and south ends of the siding and at other stations named therein.

Following the effective date of this bulletin, October 10, 1951, movement of trains at this point by train orders was superseded by the central traffic control system operating automatic block signals.

Plaintiff's train dispatcher, in charge of and controlling the movements of both of the trains which collided, ordered plaintiff's northbound train No. 48 to take, and remain on, the siding at Woodstock until authorized to proceed upon the main line by a green light from the signal at the north end of the siding. Under plaintiff's rules this order was given by setting the switches and giving the appropriate signals from the lights at both ends of the siding. Plaintiff's northbound train (Southerner, No. 48) entered the siding at Woodstock at the south end of the switch and passed southbound train 1/47 which was then standing on the main track and was displaying signals informing the crew of the northbound train, No. 48, that train

2/47 (the Crescent) was following. While plaintiff's northbound train No. 48 was entering this siding, the engineer on 1/47 also sounded the proper engine whistle to inform all that a second section (2/47, the Crescent) was following, which the engineer of northbound No. 48 properly acknowledged by two short blasts of the pneumatic horn. There was some conversation between the fireman and engineer of plaintiff's northbound train (No. 48) as to the probability of their meeting the second section (2/47, the Crescent) at Woodstock. Notwithstanding this, plaintiff's engineer on its northbound train No. 48 proceeded through the siding at a speed of between 15 and 25 miles per hour, and in violation of plaintiff's rules.

As shown by the diagram or map made in the official report of the Interstate Commerce Commission, the signal governing northbound movements on the main line track at this point was located between the siding and the main track 347 feet south of the north end of the siding. The signal governing the movement of train No. 48 from the siding on to the main track was located on the east side of this siding 270.5 feet south of the switch leading to the main track. The lights of both of these signals were red, thus warning and directing plaintiff's enginemen on No. 48 to stop as they approached these signals.

Wholly disregarding, or failing to see, the red warning of danger and the imperative command to stop, plaintiff's enginemen on its northbound train No. 48 ran through the closed switch and about 100 feet beyond it onto the main track before they stopped the train.

As soon as the fireman on the northbound train No. 48 observed that the switch to the main track was set against No. 48 he called a warning to his engineer. The engineer, instead of applying the emergency brake, made a brake application only in the first service position. The fireman, realizing that his train would not be stopped short of the switch, again warned the engineer, who again failed to apply the emergency brake but only moved the brake valve to the full service position. The emergency brake was never applied either by the engineer or the fireman, although the fireman, as well as the engineer, had a device which could properly be classified as an emergency brake valve on his side of the engine immediately in front of his seat, by application and use of which he could have applied the brakes in emergency and brought the train to a complete stop.

There is a substantial curve in the main track immediately north of the point where the engine of the northbound train stopped after it had pulled out on the main track. In about one minute after that train had stopped on the main track, southbound train 2/47, the Crescent, came around this curve and the collision occurred.

The engineer on the northbound train, No. 48, after stopping his engine on the main line, got off his engine and went to a telephone booth nearby where he was killed by the overturning portions of the demolished train when the collision occurred.

Plaintiff's rules, promulgated by it and effective at the time and place of the collision, in effect imposed the following requirements:

All members of engine and train crews must, when practicable, communicate to each other by its name the indication of each signal affecting the movement of their train or engine. (33)

When the view of the automatic block signal is obscured by any cause, the enginemen must approach all signals with great caution prepared to obey the indication given. (521)

Enginemen must keep a vigilant lookout ahead for the safety of their trains. (1307)

Enginemen must obey signals promptly and if in doubt stop the train. (1313)

When any signals affecting the movement of the trains are obscured, enginemen must approach them at reduced speed and if necessary, stop and not proceed until it is known that the way is clear. (1314)

The indication and position of switches must be carefully observed by enginemen when approaching them. (1316)

When other duties permit, firemen must keep a lookout for signals, obstructions, or defects of tracks and instantly warn the engineman. (1370)

As stated above, the engineer of the northbound train was killed in the collision. The fireman was subsequently discharged by plaintiff on account of derelictions of duty involved in this collision and particularly for violation of Rules 33 and 1370.

Plaintiff's enginemen on No. 48 (northbound) knew that both trains carried hundreds of passengers besides employees and much equipment, and that a collision would result in death or injury and destruction. They knew the train signals and lights, and also knew the rules that, when in doubt, they should stop in a place of safety and find out. Instead of doing this, they proceeded upon the main line in violation of rules and signals and caused a horrible collision, killing 17 passengers and members of crews, injuring 68, and destroying approximately one million dollars of equipment. They did, and failed to do, a series or succession of acts in violation of their orders, rules and signals.

### The Pleadings

Invoking the jurisdiction of this court on the grounds of diversity of citizenship and presence of the requisite amount in controversy and proceeding under the Declaratory Judgment Act, 28 U.S.C.A. §§ 2201, 2202, plaintiff averred that the parties had arranged for the movement of the southbound train, the Crescent, over plaintiff's lines pursuant to the terms and conditions of a written agreement between the parties, by appropriate reference incorporated with the allegations of paragraph three of the complaint.

Adverting to paragraph 7 of such agreement, plaintiff prayed first, that the court, under the authority of the Federal Arbitration Act, 9 U.S.C.A. § 1 et seq., order defendant to proceed to arbitration in accordance with the arbitration clause therein contained. In the alternative, pointing to the pertinent provisions of paragraph 4 of the same agreement, plaintiff prayed the court to declare the rights and obligations of the parties under the agreement, and to declare that defendant is liable to indemnify plaintiff for the losses resulting from the collision.

Filing its answer, defendant, for the various reasons set out therein, insisted that the detour agreement imposed no obligation upon defendant to indemnify plaintiff for the losses resulting from the collision. By counterclaim, defendant contended that plaintiff was liable to it for the damages it had sustained. It further prayed for an order requiring plaintiff to save it harmless from all damages, losses, and expenses growing out of such collision, and also all other costs and expenses, including attorney's fees, incurred or that may be incurred as a result of the collision.

Both plaintiff and defendant moved for summary judgment under Rule 56, Fed.Rules Civ.Proc. 28 U.S.C.A. Attached to and made a part of plaintiff's motion appears the official Report of the Interstate Commerce Commission of its investigation of the collision, made as required by 45 U.S.C.A. § 40, accompanied by appropriate allegations whereby plaintiff affirms the truth of the facts recited therein except for immaterial and inadvertent minor errors of description.

Catalogued with due regard for chronology, the record on submission of the

respective motions for summary judgment is set out in a footnote.[1]

## I. THE DETOUR AGREEMENT

■ Executed by the parties hereto on February 26, 1948, the agreement, the nub of this controversy, was, as recited in its caption, drafted upon the "Standard Form For Detour Agreement", in wide current usage in the railroad industry. Its prototype was adopted by the Association of American Railroads (or its predecessor, The American Railway Association), October 25, 1905, and subsequent amendments thereto have effected insubstantial changes in meaning beyond attempted clarification of the inclusive feature of the indemnity clause.

Strikingly noteworthy of comment is that for nearly fifty years the railroads have been content to solve the problems arising under similar agreements without resorting to the courts for their construction or application. Interdicted by the rule of *res inter alios acta,* affidavits submitted in behalf of plaintiff dealing with the reciprocal acts of other railroads under similar agreements are inadmissible as aids to interpreting the writing here under consideration. Distinguished counsel in able oral arguments and extremely exhaustive briefs have produced no opinion from any court precisely in point; in independent research the court has found none.

It is at once apparent that a construction of paragraph 4 of the agreement[2]

1. 1—Complaint, except Exhibits B, C, and D, which were withdrawn by stipulation recited in the order of 18 July 1952. (a) Exhibit A, consisting of contract entitled Standard Form For Detour Agreement, as executed by plaintiff and defendant.

2—The order of 18 July 1952 recites certain stipulations, principally that a justiciable issue existed at the time of filing the complaint.

3—Plaintiff's motion for summary judgment filed 12 June 1952. (a) Exhibit A, consisting of Report No. 3437 of Interstate Commerce Commission, dated January 16, 1952, covering the investigation of this accident.

4—Defendant's motion for summary judgment and denial with respect to plaintiff's motion, filed 29 August 1952.

5—Defendant's answer and counterclaim, filed 29 August 1952.

6—Defendant's request for admission filed 29 August 1952 and plaintiff's answer as amended and supplemented in plaintiff's request for admissions.

7—The court's order on pretrial hearing dated 3 February 1953.

8—Plaintiff's request for admissions.

(a) Defendant's response to plaintiff's request for admission, filed 13 April 1953.

9—The following affidavits filed on behalf of the plaintiff:

(a) R. K. McClain (b) W. H. Luckett (c) R. L. Eddington (d) J. H. Scott (e) H. A. Cline (f) K. C. Shults (g) P. H. Lynch (h) E. Hart (i) H. H. Siddall (j) A. D. Perkins.

10—The following affidavits filed on behalf of defendant:

(a) F. W. Kirchner (b) Richard E. McWilliams, Jr. (c) Claude Johnston (d) L. F. Wade (e) P. J. Gray (f) Jack Small (g) Hubert Hall (h) Fred A. Powell (i) J. S. Swan (j) E. J. Clark (k) Thomas B. Henley.

2. The Home Company shall not be held liable for or on account of any loss, damage, or delay, to the trains, engines, cars or other property of any kind of either company, nor to freight, baggage or other property of any kind carried in or upon such trains, engines or cars, nor for or on account of any injury to or death of passengers or employes of either company, or for or on account of any injury to the person or property of any other individual or individuals, company or companies, corporation or corporations whatsoever, which may be incurred or sustained by reason of such trains being detoured, or by reason of such trains being delayed in such detouring, in whatever manner the same may be caused or occasioned, whether by or through the negligence of the Home Company, its agents or servants, or by reason of defects in tracks, structures, or facilities furnished by the Home Company, or otherwise, it being understood and agreed that all risk of such delays, loss, damage, injury and death shall be and is hereby assumed by the Foreign Company, and the Foreign Company shall and will hold harmless the Home Company from and against all liabilities or claims for all such delay, loss, damage, injury and death, and shall and will execute and deliver, or cause to be executed and deliv-

is essential to an orderly and logical adjudication of the issues in this litigation. Sound reasoning would seek answers to the following questions:

(A) Are the indemnity and exemption provisions applicable only when the losses and damages are *proximately caused by* the operation of the detouring train?

(B) Are the indemnity and exemption provisions intended to apply where the losses and damages are the result of wanton conduct of the Home Company's employees?

(C) Are the indemnity and exemption provisions void (1) as a matter of public policy, or (2) as *ultra vires*?

### A. Proximate Cause

▮▮▮ Pressing vigorously at the threshold, defendant argues persuasively that the phraseology of paragraph 4 of the agreement, *"which may be incurred or sustained by reason of such trains being detoured"*, is the equivalent of *"proximately caused by"* the operation of the detouring train. It is not oversimplification to observe that, if defendant should prevail upon this insistence, the case would be at an end, since the in-cident obviously occurred because of improper operation by plaintiff not of the detouring train, but of a Home Company train.

The argument is supported by citation of cases [3] translating the phrase, *"by reason of"*, and phrases of similar import to mean *"proximately caused by."* It is no doubt true that in some circumstances this equivalence of meaning may obtain.[4] However, in construing a contract it is imprudent to wrench clauses and phrases from context or to disregard the nature of the instrument, the condition of the parties and the objects they had in view. Cf. Owens v. American Surety Co. of New York, 5 Cir., 1954, 217 F.2d 334.

Here, the words, *"by reason of such trains being detoured"*, are immediately followed by the expression, *in whatever manner the same may be caused or occasioned, whether by or through the negligence of the Home Company, its agents or servants, or by reason of defects in tracks, structures, or facilities furnished by the Home Company, or otherwise."* Entered into between two corporations moving in an area of comparative economic equality, dealing with the familiar transaction of their everyday

---

ered, to the Home Company, upon request, a full and complete release, satisfaction and discharge of all claims therefor, and will pay, or cause to be paid, all costs and expenses incurred by either Company in the clearing of wrecks and repairs to equipment, track and property in which by reason of detour movements covered by this agreement the engines, trains or cars of the Foreign Company are concerned, expenses and attorney's fees incurred in defending any action which may be brought against the Home Company on account of any such claim or liability and any judgment which may be rendered against the Home Company on account thereof. The Foreign Company shall pay all fines, penalties, costs and expenses imposed upon or incurred by the Home Company by reason of any violation by the Foreign Company of the Safety Appliance or other State or Federal Laws, and hold the Home Company harmless therefrom.

**3.** Houston & T. C. R. Co. v. Anglin, 1907,

45 Tex.Civ.App. 41, 99 S.W. 897, 898; Benedict v. Union Agricultural Society, 1902, 74 Vt. 91, 52 A. 110; Waters v. National Life & Accident Ins. Co., 1945, D.C., 61 F.Supp. 957; Cairnes v. Hillman Drug Co., 1926, 214 Ala. 545, 108 So. 362; Saucier's Case, 1923, 122 Me. 325, 119 A. 860; Chrysler Motors v. Royal Indemnity Co., 1946, 76 Cal.App.2d 785, 174 P.2d 318; Chicago & N. W. Ry. Co. v. Chicago Packaged Fuel Company, 7 Cir., 1952, 195 F.2d 467; National Mutual Casualty Co. v. Clark, 1942, 193 Miss. 27, 7 So.2d 800, 140 A.L.R. 927; Southern Pacific Co. v. Layman, 1944, 173 Or. 275, 145 P.2d 295; American Book Co. v. State, 1927, 216 Ala. 367, 113 So. 592; Little Cahaba Coal Co. v. Aetna Life Ins. Co., 1915, 192 Ala. 42, 68 So. 317; Central Surety & Ins. Corp. v. Hinton, 1939, 233 Mo.App. 1218, 130 S.W.2d 235.

Contra: Cacey v. Virginian R. Co., 4 Cir., 1936, 85 F.2d 976.

**4.** Cf. Southern Bell Tel. & Tel. Co. v. Mayor, 5 Cir., 1935, 74 F.2d 983.

concerns, couched in the terse language of businessmen, intended to apply to an almost infinite variety of prospective and undetermined events, the contract should be read, not with the thought of measuring it by the precision of legalistic niceties, but with an eye single to discerning the intentions of the parties.

So viewed, it would seem that the descriptive phrase, *"in whatever manner the same may be caused * * *"* was intended expressly to eliminate the restrictive requirement of a proximate, causal connection between operation of the detouring train and damages and to apply the indemnity and exemption provisions to damages resulting which would not have occurred but for the fact of the detour, the existence of additional hazard imposed by the very presence of a foreign train on the tracks in use, even though the loss and damage directly resulted from the negligence of the indemnitee's own servants. Thus construed, it would seem that the clause, *"by reason of such trains being detoured"*, serves the function only of eliminating from the indemnity provisions those losses and damages in which the detouring train had no part whatsoever.

### B.  Wanton Conduct

■■  Eloquently and earnestly plaintiff insists that the conduct of its employees under all the circumstances amounted to no more than simple negligence, asserting that if its engineer be held to have committed murder, it must perforce be reckoned that he likewise committed suicide. But, pointing to the impact of the phrase, *"or otherwise"*, upon the clause, *"whether by or through the negligence of the Home Company"*, it maintains that the indemnity clause was intended to encompass the consequences of wilful or wanton conduct,

as well as those of simple negligence. Forcibly marshaling the undisputed facts, defendant contends that plaintiff's servants were guilty of wilful, wanton even criminal,[5] conduct, and that the indemnity clause does not govern damages so caused.

The phrase, *"or otherwise"*, is no virtual Pandora's Box. Some fealty is due the doctrine against extending an indemnity agreement beyond the express language of coverage. This phrase is so indefinite in meaning as to be intelligible only in the light of the context in which it is used. Its context is not suggestive of damages occasioned by wilful or wanton conduct and its field of operation is limited by the principle of *ejusdem generis*.[6]

Thomas v. Atlantic Coast Line R. Co., 5 Cir., 1953, 201 F.2d 167, 170, settled the issue for this court. There an indemnity agreement included the catch-all phrase, *"or otherwise"*; the court held that such phrase did not expand the coverage of the indemnity *"to exculpate the railroad from the consequences of its own wilful or wanton negligence."* The court not only refused to construe the language to exonerate from wilful or wanton conduct, but stated:

"* * * if it could be said that the lease agreement did propose to exempt the railroad from liability for the consequences of a willful breach of duty it would, to that extent be illegal."

Striving to construe this contract in such fashion as not to render it illegal or void, this court concludes that the present agreement governs the consequences of simple negligence, but not those of wilful or wanton conduct. *Sub silentio* approval of this result may be found in Thomas v. Atlantic Coast Line

---

5.  Title 48, Code of Alabama 1940, Sec. 438 provides that any engineer or other designated trainman, who negligently causes death in the operation of his engine, shall be imprisoned in the penitentiary for not less than one nor more than five years.

6.  9 Am.Jur., "Carriers", Sec. 770, page

898;  George H. Dingledy Lumber Co. v. Erie R. Co., 1921, 102 Ohio St. 236, 131 N.E. 723; Kay v. Pennsylvania R. Co., 156 Ohio St. 503, 103 N.E.2d 751 (1952); Dobie on Bailments and Carriers, page 384; Southern Pac. Co. v. Layman, 1944, 173 Or. 275, 145 P.2d 295.

R. Co., supra, and, to that court, as to this, the distinction between indemnity and exemption aspects of similar agreements is of no controlling significance.

### C. Validity of the Indemnity and Exemption Clauses

■ Enough has been written to indicate the view of the court that the indemnity and exemption provisions of the detour agreement, limited by the foregoing construction to losses and damages resulting from simple negligence, are inoffensive to public policy. Generally, cases cited by the defendant as holding to the contrary [7] may be distinguished. Most of them relate to arrangements that would deprive a member of the public, situated at an economic disadvantage, of relief from damages caused by the simple negligence of a party required by the public interest to accept responsibility.

Rejected also is defendant's *ultra vires* argument. It seems to the court that it was of the essence of the proper business of defendant railroad to enter into this detour agreement, including its valid indemnity and exemption provisions, as a condition to permitting it to continue movement of its train in circumstances where otherwise its operation would be halted or seriously impeded. Conversely, plaintiff does receive revenue under the contract for the use of its lines, undoubtedly a legitimate piece of railroad business. This being so, Alabama Great Southern R. Co. v. Loveman Compress Co., 1916, 196 Ala.

7. Georgia Fruit Exchange v. Turnipseed, 1913, 9 Ala.App. 123, 62 So. 542; Housing Authority of Birmingham District v. Morris, 1943, 244 Ala. 557, 14 So.2d 527; Ex parte Mobile Light & R. Co., 1924, 211 Ala. 525, 101 So. 177, 34 A.L.R. 921; Denver Union Terminal R. Co. v. Cullinan, 1922, 72 Colo. 248, 210 P. 602, 27 A.L.R. 154; Mobile & Ohio R. Co. v. Hopkins, 1868, 41 Ala. 486; Western Union Telegraph Co. v. Priester, 21 Ala. App. 587, 111 So. 199, certiorari denied, 1927, 215 Ala. 435, 111 So. 200, reversed, 1928, 276 U.S. 252, 48 S.Ct. 234, 72 L.Ed. 555; Southern Express Co. v. Owens, 1906, 146 Ala. 412, 41 So. 752, 8 L.R.A., N.S., 369; Southern Ry. Co. v. Jones, 1902, 132 Ala. 437, 31 So. 501; Alabama G. S. R. Co. v. Thomas, 1887, 83 Ala. 343, 3 So. 802, on second appeal, 1889, 89 Ala. 294, 7 So. 762; United States v. Atlantic Mutual Insurance Co., 1952, 343 U.S. 236, 72 S.Ct. 666, 96 L.Ed. 907; Railroad Co. v. Lockwood, 1873, 17 Wall. 357, 371, 84 U.S. 357, 21 L.Ed. 627; Willock v. Pennsylvania R. Co., 1895, 166 Pa. 184, 30 A. 948, 27 L.R.A. 228; Hill v. Carolina Freight Carriers Corp., 1952, 235 N. C. 705, 71 S.E.2d 133; Otis Elevator Co. v. Maryland Casualty Co., 1934, 95 Colo. 99, 33 P.2d 974; Fairfax Gas & Supply Co. v. Hadary, 4 Cir., 1945, 151 F.2d 939; 6 Williston on Contracts, Sec. 1751 C (Revised Ed.); 2 Restatement of Contracts, Sec. 575.

Contra: N. Y. Cent. R. Co. v. Long Island R. Co., 2 Cir., 1932, 57 F.2d 144; Hartford Fire Ins. Co. v. Chicago M. & St. P. R. Co., 1899, 175 U.S. 91, 100, 20 S.Ct. 33, 44 L.Ed. 84; Boston & A. R. Co. v. Mercantile Deposit & Trust Co., 1896, 82 Md. 535, 34 A. 778; Buckeye Cotton Oil Co. v. Louisville & N. R. Co., 6 Cir., 1928, 24 F.2d 347; Luton Mining Co. v. Louisville & N. R. Co., 1938, 276 Ky. 321, 123 S.W.2d 1055; John P. Gorman Coal Co. v. Louisville & N. R. Co., 1926, 213 Ky. 551, 281 S.W. 487; Terminal Railroad Ass'n v. Ralston-Purina Co., 1944, 352 Mo. 1013, 180 S.W.2d 693; Culmer v. Baltimore & O. R. Co., D.C. W.D.Pa., 1941, 1 F.R.D. 765; Chicago & N. W. Railroad Co. v. Chicago Packaged Fuel Co., D.C.N.D.Ill., 1951, 99 F.Supp. 361; McNicholas Transfer Co. v. Pennsylvania R. Co., 6 Cir., 1946, 154 F.2d 265; St. Paul Union Depot Co. v. Minn. S. P. & S. S. M. Ry., 226 N.W. 572 (1929); Post & McCord v. New York Municipal Ry. Corp., 1919, 187 App.Div. 167, 175 N.Y.S. 392; Long Island R. Co. v. American Bridge Co., 1916, 175 App. Div. 170, 161 N.Y.S. 543; National Transit Co. v. Davis, 3 Cir., 1925, 6 F.2d 729; Alabama Great Southern R. Co., v. Demobille, 1910, 167 Ala. 292, 52 So. 406; Southern R. Co. v. Blunt & Ward, 5 Cir., 1908, 165 F. 258; McKinney v. Mobile & O. R. Co., 1926, 215 Ala. 101, 109 So. 752; Griffiths v. Henry Broderick, Inc., 1947, 27 Wash.2d 901, 182 P.2d 18, 175 A.L.R. 1; Kansas City, M. & B. R. Co. v. Southern Railway News Co., 1899, 151 Mo. 373, 52 S.W. 205, 45 L.R.A. 380; Baltimore & O. S. W. R. Co. v. Voight, 1899, 176 U.S. 498, 20 S.Ct. 385, 44 L. Ed. 560; Northern Pacific R. Co. v. Thornton Bros., 206 Minn. 193, 288 N.W. 226.

683, 72 So. 311, vouchsafes no consolation to either party.

## II. Application of the Detour Agreement

■■■ Recognizing that on motion for summary judgment the court's function is limited to a determination as to whether a genuine issue exists as to any material fact and that genuine issues of material fact are not to be resolved by the judge because both sides have moved for summary judgment,[8] the court finds that the facts are unclouded by even the shadow of dispute. And while, as a general proposition, issues of negligence, including the related issue of wanton conduct, are ordinarily not susceptible of summary adjudication, there are cases when a summary judgment may properly be rendered, e. g., Surkin v. Charteris, 5 Cir., 1952, 197 F.2d 77.

■■■ The stark facts, stripped altogether of inferences dictated by common sense in their recital in the Commission's report and supporting affidavits, compel the conclusion that the losses and damages sustained by both parties hereto resulted from the wanton conduct of plaintiff's employees. It would be difficult to imagine conduct more illustrative of the classical definition of wantonness than that of plaintiff's engineer and fireman on the Southerner. To move a train from a passing track onto a main line in violation of signals and contrary to the clear prohibition of basic operating rules is plainly a conscious placing of lives and property in appalling peril, and in a known position of danger. That these two men also consciously exposed themselves to the same danger is not so contrary to human experience as to contradict the conclusion that they were guilty of wanton conduct.

Since the detour agreement, as construed by the court, provides neither exemption from nor indemnity for the consequences of wanton conduct, and since the losses and damages sustained by the respective parties hereto clearly resulted from such conduct, it necessarily follows that the agreement has no application to the facts of this case and that all of such losses and damages must be borne by plaintiff. However, the issue of damages in defendant's counterclaim may not be decided summarily, but must await further proceedings herein.

## III. Arbitration

■■■ Although there is sanction for defendant's unchallenged statement that plaintiff has abandoned its insistence on arbitration, arising from plaintiff's failure to refer to this issue in oral arguments or briefs, the court is not inclined thus lightly to brush it aside. But an incongruous result would be reached by a holding that losses and damages occasioned by wanton conduct were contemplated by paragraph 7,[9] relating to arbitration and not by paragraph 4, pertaining to exemption and indemnity. Moreover, in view of the defendant's stoutly maintained contention that the detour agreement is void *ab initio* [10] and of the necessity to construe the agree-

8. Walling v. Richmond Screw Anchor Co., 2 Cir., 1946, 154 F.2d 780; Colby v. Klune, 2 Cir., 1949, 178 F.2d 872; Krug v. Santa Fe Pac. R. Co., 1946, 81 U.S. App.D.C. 288, 158 F.2d 317; Garrett Biblical Institute v. American University, 1947, 82 U.S.App.D.C. 263, 163 F.2d 265.

9. All differences soever which shall, consequent upon the detouring of trains, arise under this agreement, or otherwise, between the parties shall be submitted to the Committee on Operating Rules, Operating-Transportation Division, as then constituted, of the Association of American Railroads on thirty (30) days' written notice to the other party. All pro-

ceedings before such Committee shall be had in accordance with such rules as it shall, from time to time, promulgate and the decisions of such Committee shall be final and binding on and accepted as such and performed by all the parties.

10. Petition of Prouvost Lefebvre of Rhode Island, Inc., 1952, D.C., 105 F.Supp. 757; 6 Williston on Contracts, Rev.Ed., Sec. 1920, at page 5369; Kulukundis Shipping Co. v. Amtorg Trading Corp., 2 Cir., 1942, 126 F.2d 978; Republic of Colombia v. Cauca Co., 1903, 190 U.S. 524, 23 S.Ct. 704, 47 L.Ed. 1159; Finsilver, Still & Moss v. Goldberg, Maas & Co., 1930, 253 N.Y. 382, 171 N.E. 579, 69 A.L.R. 809.

ment as a matter of law,[11] the court is constrained merely to hold that the arbitration provisions have no field of operation in this case.

A judgment consistent with this opinion will be entered. Parties will submit suggested forms of judgment at 10:00 o'clock, a. m., January 7, 1955.

11. Merchants' Grocery Co. v. Talladega Grocery Co., 1928, 217 Ala. 334, 116 So. 356; Headly v. Aetna Ins. Co., 1918, 202 Ala. 384, 80 So. 466; American Guaranty Co. v. Caldwell, 9 Cir., 1934, 72 F.2d 209; Marchant v. Mead-Morrison Mfg. Co., 1929, 252 N.Y. 284, 169 N.E. 386.