**CHICAGO, ROCK ISLAND AND PACIF-
IC RAILROAD COMPANY, Plaintiff-
Appellant,**

v.

**CHICAGO, BURLINGTON AND QUINCY
RAILROAD COMPANY, Defendant-
Appellee.**

**HARRIS TRUST AND SAVINGS BANK,
Plaintiff-Appellant,**

v.

**CHICAGO, BURLINGTON AND QUINCY
RAILROAD COMPANY, Defendant-
Appellee.**

**Nos. 17939, 17940.**

United States Court of Appeals,
Seventh Circuit.

Jan. 19, 1971.

Rehearing Denied Feb. 22, 1971.

John M. O'Connor, O. L. Houts, E. Houston Harsha, Richard B. Rogers, Leo K. Wykell, Kirkland, Ellis, Hodson, Chaffetz & Masters, Theodore E. Desch, Chicago, Ill., for plaintiffs-appellants.

Douglas C. Moir, Edward J. Wendrow, Bryce L. Hamilton, Richard T. Cubbage, Gen. Counsel, T. G. Schuster, Associate Gen. Counsel, Chicago, Ill., for defendant-appellee; Winston, Strawn, Smith & Patterson, Chicago, Ill., of counsel.

Before FAIRCHILD, CUMMINGS and PELL, Circuit Judges.

CUMMINGS, Circuit Judge.

This case involves the liability for damages arising from a major railroad accident occurring on the tracks of the Chicago, Burlington and Quincy Railroad Company at Montgomery, Illinois. The facts underlying the disaster are fully narrated in the opinion below (301 F.Supp. 72) and need only be highlighted here.

Commencing on September 25, 1964, the Chicago, Rock Island and Pacific Railroad Company was unable to use its own line to Chicago because of a defective bridge at Joliet, Illinois. Therefore, the Rock Island began to detour its trains over Burlington's Streator branch to Montgomery pursuant to a reciprocal Standard Form for Detour Agreement that had been executed by the two railroads in January 1958.

On the night of September 27, 1964, an eastbound Rock Island passenger train received a stop signal and thereupon halted on the Streator branch a few hundred feet short of the signal bridge of the Burlington's main line. At this time, a Burlington train speeding westward on the main line received a proceed signal and ran head-on into the Rock Island train, killing 4 persons, injuring 250 others, and destroying over $1,000,000 in property.

The district court found that the Burlington had used a switching signal system that was not in proper condition and was not safe to operate. This was held to be a violation of Section 25 of the Interstate Commerce Act (49 U.S.C. § 26), and of an Interstate Commerce Commission order issued pursuant thereto (49 CFR 136). However, by virtue of the indemnification provisions in the Standard Form for Detour Agreement, the district court entered a judgment awarding the Burlington $860,218.62. The judgment also ordered the Rock Island to defend lawsuits arising out of this accident and to hold the Burlington harmless for any ensuing judgments, with the Rock Island to reimburse the Burlington for its legal expenses. Plaintiffs appeal from this decision, and we affirm.

The outcome of this case largely depends upon the proper construction to be accorded to paragraph 4 of the Standard Form for Detour Agreement. This was adopted by the predecessor of the Association of American Railroads in 1905 and, as amended, provides:

"The Home Company [Burlington] shall not be held liable for or on account of any loss, damage, or delay, to the trains, engines, cars or other property of any kind of either Company, nor to freight, baggage or other property of any kind carried in or upon such trains, engines or cars, nor for or on account of any injury to or death of passengers or employes of either company, or for or on account of any injury to the person or property of any other individual or individuals, company or companies, corporation or corporations whatsoever, *which may be incurred or sustained by reason of such trains being detoured, or by reason of such trains being delayed in such detouring, in whatever manner the same may be caused or occasioned, whether by or through the negligence of the Home Company, its agents or servants, or by reason of defects in tracks, structures, or facilities furnished by the Home Company, or otherwise, it being understood and agreed that all risk of such delays, loss, damage, injury and death shall be and is hereby assumed by the Foreign Company [Rock Island]*, and the

Foreign Company shall and will hold harmless the Home Company from and against all liabilities or claims for all such delay, loss, damage, injury and death, and shall and will execute and deliver, or cause to be executed and delivered, to the Home Company, upon request, a full and complete release, satisfaction and discharge of all claims therefor, and will pay, or cause to be paid, all costs and expenses incurred by either Company in the clearing of wrecks and repairs to equipment, track and property in which *by reason of detour movements covered by this agreement the engines, trains or cars of the Foreign Company are concerned,* expenses and attorney's fees incurred in defending any action which may be brought against the Home Company on account of any such claim or liability and any judgment which may be rendered against the Home Company on account thereof. *The Foreign Company shall pay all fines, penalties, costs and expenses imposed upon or incurred by the Home Company by reason of any violation by the Foreign Company of the Safety Appliance or other State or Federal Laws, and hold the Home Company harmless therefrom."* (Emphasis supplied.)

Rock Island first charges that the district court erroneously construed the indemnity provisions of the Detour Agreement to apply to the instant collision. Rock Island contends that the Agreement was not intended to apply where the Foreign Company's train was merely present but did not "cause" the damage. It also urges that the Agreement does not include statutory liability imposed by virtue of the Federal Safety Appliance Act. We disagree with both propositions.

The clear intent and specific language of the Agreement apply to the circumstances of this wreck. Unlike Pennsylvania RR. Co. v. Indiana Harbor Belt RR. Co., 261 F.2d 939 (7th Cir. 1958), relied upon by Rock Island, the instant agreement unequivocally provides for indemnity against risk of loss to the Home Company resulting from the Foreign Company's mere involvement in an accident during detour. The Agreement states that the detouring railroad must assume the risks of injury to others "which may be incurred or sustained by reason of such trains being detoured, or by reason of such trains being delayed in such detouring, in whatever manner the same may be caused or occasioned * * *." Similarly, the burden of loss to either railroad is placed upon the Foreign Company where "by reason of detour movements covered by this agreement the engines, trains or cars of the Foreign Company are concerned * * *." The clear import of such all-inclusive language is to shift all losses to the Foreign Company attributable to its occasional exercise of detour privileges, regardless of the manner of its actual involvement in the occurrence. Cf. Alabama Great Southern RR. Co. v. Louisville and Nashvile RR. Co., 127 F. Supp. 363, 369–370 (N.D.Ala.1955), reversed on other grounds, 224 F.2d 1, 4 (5th Cir. 1955). The "trackage agreement" in Pennsylvania RR. Co. v. Indiana Harbor Belt RR. Co., *supra*, on the other hand, regulated significantly different practical arrangements and employed language limiting responsibility for indemnification to losses "caused" by trains using the right of way. We see nothing in the language or purpose of the Detour Agreement to justify the suggested distinction between "causation" by Rock Island and its mere involvement as a necessary "condition" to the occurrence.

We also conclude that the Agreement requires indemnification for losses resulting from Burlington's violation of the Federal Safety Appliance Act. The language of the Agreement provides for the broadest possible indemnification coverage. It releases the Home Railroad from liability for any loss "in whatever manner the same may be caused or occasioned, whether by or through the negligence of the Home Company, its agents or servants, or by reason of defects in

tracts, structures, or facilities furnished by the Home Company, or otherwise * * *." In Chicago, Milwaukee, St. Paul & Pacific RR. Co. v. Alva Coal Corporation, 365 F.2d 49 (7th Cir. 1966), this Court construed similar language in a trackage agreement and held that "negligence" included per se statutory liability imposed for violation of 45 U. S.C. § 11. Since the accident here resulted from a malfunction in Burlington's interlocking station, it is also covered by the indemnity provisions as a defect in a track, structure, or facility furnished by the Home Company, regardless of the legal theory upon which liability for such defects may rest.

In 1913, the second sentence was added to paragraph 4 of the Detour Agreement, providing:

"The Foreign Company [Rock Island] shall pay all fines, penalties, costs and expenses imposed upon or incurred by the Home Company [Burlington] by reason of any violation by the Foreign Company of the Safety Appliance or other State or Federal Laws, and hold the Home Company harmless therefrom."

The Rock Island seizes upon this sentence to argue that no obligation was imposed upon it unless it violated the Federal Safety Appliance Act. However, as the district court noted, the first sentence of paragraph 4 does not mention fines or penalties. This additional sentence was added to cover such matters when incurred by the Home Company when the Foreign Company has violated the Federal Safety Appliance Act. This sentence has nothing to do with either the Home Company's violations of the Act or civil liabilities which it might incur. It was obviously added because the Home Company might incur a liability for a statutory penalty on account of a violation by the Foreign Company.

Rock Island objects that the conclusions below are at odds with the principle requiring "strict" construction of indemnity contracts purporting to relieve the indemnities of its own negligence. See e. g., Auto Owners Mutual Insurance Co. v. Northern Indiana Pub. Serv. Co., 414 F.2d 192, 194 (7th Cir. 1969). "Strict" construction, however, like "liberal" construction, is a matter of degree and emphasis, dependent not only upon the clarity of the contract's language, but the nature of the relationships established by the contract, and concern for public welfare and policy. In this case, unlike those cases relied upon by Rock Island, such as Chicago & N. W. Ry. Co. v. Chicago Packaged Fuel Co., 195 F.2d 467 (7th Cir. 1952), and Pennsylvania RR. Co. v. Indiana Harbor Belt RR. Co., 261 F.2d 939, 943 (7th Cir. 1958), the reciprocal Detour Agreement equally distributes the risks between the parties by placing them upon the shoulders of the detouring railroad. The Agreement does not threaten to encourage carelessness on the part of the indemnitee, or to burden unfairly a party because of discrepancies in bargaining position. The language employed, though broad, is sufficiently specific and manifests the parties' intent to require indemnification by the Foreign Company regardless of the proximate "cause" of the accident or legal theory upon which liability might be grounded. Accordingly, we see no inconsistency between our conclusions here and those cases which have "strictly" construed other indemnity contracts negating a claimed right of indemnification.

These considerations also lead us to reject Rock Island's argument that the indemnity provisions of the Agreement should be invalidated as against public policy. Unlike Boyer v. Atchison, Topeka and Santa Fe Ry. Co., 34 Ill.App.2d 330, 181 N.E.2d 372 (1st Dist.1962), affirmed, 38 Ill.2d 31, 230 N.E.2d 173 (Ill.Sup.Ct.1967), certiorari denied, 390 U.S. 949, 88 S.Ct. 1038, 19 L.Ed.2d 1140 the distribution of risks undertaken by this contract does not impair the policies or force of the Federal Safety Appliance Act. See Inland Container Corp. v. Atlantic Coast Line RR. Co., 266 F.2d 857, 861 (5th Cir. 1959); Chicago & N. W.

Ry. Co. v. Davenport, 205 F.2d 589, 594 et seq. (5th Cir. 1953); Jacksonville Terminal Co. v. Railway Express Agency, Inc., 296 F.2d 256, 259, note 1 (5th Cir. 1961), certiorari denied, 369 U.S. 860, 82 S.Ct. 949, 8 L.Ed.2d 18. We agree with the court in Colorado Milling & Elevator Co. v. Terminal RR. Association, 350 F.2d 273, 278–279 (8th Cir. 1965), certiorari denied, 382 U.S. 989, 86 S.Ct. 563, 15 L.Ed.2d 476, that these provisions of the contract represented an adjustment of the private relations between the two carriers but did not alter their duties to the public as common carriers.

■ Rock Island next contends that the Detour Agreement was null and void because it amounted to a "trackage right agreement" which was not authorized or approved by the Interstate Commerce Commission. We need not consider whether such an agreement would be unenforceable under all circumstances without approval of the Commission. Nor need we decide whether Rock Island is estopped from raising this argument. We hold instead that the Detour Agreement does not constitute a "trackage right" agreement within the purview of Section 5(2) (a) (ii) of the Interstate Commerce Act, 49 U.S.C. § 5(2) (a) (ii).[1]

■ "Trackage rights," unlike the instant Detour Agreement, involve continuing or permanent easements or licenses granted to a foreign carrier to operate over the tracks and right of way of another carrier. See Thompson v. Texas Mexican Ry. Co., 328 U.S. 134, 140, 66 S.Ct. 937, 90 L.Ed. 1132. The thrust of the statute dealing with such adjustments, as disclosed in its heading, is to vest control over railroad unifications in the hands of the Interstate Commerce Commission. Insofar as an agreement between railroads tends to expand or alter existing carrier routes on a permanent or extended basis, they may be viewed as trackage rights. The Detour Agreement, however, is limited to extraordinary circumstances which countenance no enduring alteration in carrier routes. It is, in addition, subject to the discretionary power of the Home Company to grant or deny permission to the detouring railroad to operate over its tracks. We find nothing in the cases or rulings cited to this Court by Rock Island which compels us to conclude that such an emergency measure requires Interstate Commerce Commission approval to be enforceable.

■ The final argument raised by Rock Island is that the district court erred in finding that the malfunction of the interlocking station did not constitute willful or wanton misconduct on Burlington's part. Rock Island did not plead this matter as a defense to the contract or argue it before the district court. Cf. Seaboard Surety Co. v. Harbison, 304 F.2d 247, 249 (7th Cir. 1962). In any event, we agree with the district court that Rock Island failed to establish willful or wanton misconduct on the part of Burlington's tower operator. We find no clear error in the district court's conclusion that the operator failed to notice the warning light due to the rush of his duties, not because he simply ignored the device or failed to act upon its signal.

The judgment of the district court is affirmed.

---

1. Section 5(2) (a) (ii) of the Act states: Unifications, mergers, and acquisitions of control.

"(2) (a) It shall be lawful, with the approval and authorization of the Commission, as provided in subdivision (b) of this paragraph—

\* . \* \* \* \*

"(ii) for a carrier by railroad to acquire trackage rights over, or joint ownership in or joint use of, any railroad line or lines owned or operated by any other such carrier, and terminals incidental thereto."