**NATIONAL RAILROAD PASSENGER CORPORATION**

v.

**CONSOLIDATED RAIL CORPORATION,**
**Appellant.**

**Nos. 88–7238, 88–7245.**

United States Court of Appeals, District of Columbia Circuit.

Argued Oct. 6, 1989.

Decided Jan. 5, 1990.

Laurence Z. Shiekman with whom Thomas E. Zemaitis, Philadelphia, Pa., Gerald P. Norton, and Bruce B. Wilson, Washington, D.C., were on the brief for appellant.

Deanne C. Siemer, Washington, D.C., for appellee. William R. Perlik, Michael L. Burack, Harold R. Henderson, and T. Michael Kerrine, Washington, D.C., were on the brief for appellee.

Before BUCKLEY, D.H. GINSBURG, and SENTELLE, Circuit Judges.

Opinion for the Court filed by Circuit Judge D.H. GINSBURG.

D.H. GINSBURG, Circuit Judge:

Consolidated Railroad Corporation, or Conrail, operates freight trains in the northeast corridor over rails owned by the

National Railroad Passenger Corporation, known as Amtrak, pursuant to an Operating Agreement between the two carriers. On January 4, 1987, a Conrail locomotive collided with an Amtrak train on Amtrak's main passenger line near Chase, Maryland, killing fifteen passengers and the Amtrak engineer and injuring hundreds of other passengers and some railroad employees.

According to the Conrail engineer in control of the locomotive, who has since pled guilty to one count of manslaughter,

> the Conrail crew had recently used marijuana, was speeding, was operating a train in which the cab signal had been rendered inoperative because the light bulb had been removed from it, and was operating a train in which an audible warning device had been intentionally disabled. He has also admitted that he failed to call out signals to his brakeman, as required by applicable safety regulations, that he failed to maintain a proper lookout, and that he did not adhere to the cab signals or the wayside signals.

*National Railroad Passenger Corp. v. Consolidated Rail Corp.*, 698 F.Supp. 951, 952–53 (D.D.C.1988). According to Amtrak, this conduct also violated its safety rules, to which Conrail and its employees were subject, pursuant to Article 2, § 2 of the Operating Agreement, when operating on Amtrak's rails, and may also have violated regulations of the Federal Railroad Administration.

Inevitably, scores of personal injury and wrongful death actions were filed against the carriers, alleging that one or both of them had acted with gross negligence or recklessness, or engaged in willful and wanton misconduct. With respect to the suits filed by Amtrak passengers and employees, Conrail invoked the clause of the Operating Agreement obligating Amtrak to defend it against, and to indemnify it for, liability for the plaintiffs' injuries or deaths. Amtrak refused to do so, however, on the ground that the indemnification provision of the Agreement is contrary to public policy and therefore not enforceable to the extent that it covers conduct more culpable than ordinary negligence and the

award of punitive damages. Amtrak sued Conrail for a declaratory judgment to that effect. Conrail then invoked the arbitration procedures of the Operating Agreement, and sued Amtrak to compel arbitration, pursuant to the Federal Arbitration Act, 9 U.S.C. §§ 1 *et seq.*

The district court first refused to compel arbitration on the ground that "it is the duty of courts, not arbitrators, to decide whether a particular arbitration clause is operative," *Consolidated Rail Corp. v. National Railroad Passenger Corp.*, 657 F.Supp. 405, 407 (D.D.C.1987) (*citing AT & T Technologies, Inc. v. Communication Workers of America*, 475 U.S. 643, 649, 106 S.Ct. 1415, 1418, 89 L.Ed.2d 648 (1986)), and that "the question of public policy is ultimately one for resolution by the courts," *id.* at 408 (*quoting W.R. Grace & Co. v. Local Union 759, Int'l Union of the United Rubber, Cork, Linoleum & Plastic Workers of America*, 461 U.S. 757, 766, 103 S.Ct. 2177, 2183, 76 L.Ed.2d 298 (1983)). The court later determined that "public policy will not allow enforcement of indemnification provisions that appear to cover such extreme misconduct because serious and significant disincentives to railroad safety would ensue."

We conclude, however, that the district court should have compelled arbitration as provided in the Operating Agreement between the parties. Consequently, we reverse, without addressing either the public policy issue or the substantive issues of contract interpretation that the parties raise. The carriers are remitted to arbitration by the terms of their contract, and may raise before the arbitrator their dispute over the scope of the indemnification clause. If the arbitrator determines that the contract obliges Amtrak to indemnify Conrail for the consequences of the aggravated misconduct alleged in the various lawsuits against it, then Amtrak may properly put the public policy issue before a court.

## I. BACKGROUND

The indemnification clauses under which Conrail claims a substantive contract right

**1068**

against Amtrak, Article 5, §§ 3 & 6 of the Operating Agreement, provide for Amtrak, without express qualification, to indemnify Conrail and its employees for harms to the persons and property of Amtrak employees and passengers. These two sections (along with Article 5, § 2, which provides for Conrail to indemnify Amtrak for harms to the persons and property of Conrail employees) are identical in all respects save the designation of which category of person is involved; we set out Article 5, § 3, as an example:

> Amtrak agrees to indemnify and save harmless Conrail and Conrail Employees, irrespective of any negligence or fault of Conrail or Conrail Employees, or howsoever the same shall occur or be caused, from any and all liability for injury to or death of any Amtrak Passenger, or for loss of, damage to, or destruction of the property of such Amtrak Passenger.

Relatedly, Article 5, § 16 requires the indemnifying party to defend, at its own expense, the party sued.

The arbitration clause under which Conrail claims a procedural contract right against Amtrak, Article 4, § 3 of the Operating Agreement, is a broad one. It provides:

> Except as otherwise provided in this Agreement, any claim or controversy between Amtrak and Conrail concerning the interpretation, application or implementation of this Agreement shall be submitted to binding arbitration in accordance with the provisions of the Arbitration Agreement dated April 16, 1971, among Amtrak and certain other railroads.

The Arbitration Agreement to which the Operating Agreement refers, in turn provides (in § 4.7):

> Any claim or controversy covering the interpretation, application or implementation of this Agreement shall be submitted to the National Arbitration Panel [NAP] for arbitration in accordance with the provisions hereof as interpreted and applied by the National Arbitration Panel.

The district court found that the arbitration clause bespoke the parties' "manifest intent to arbitrate ... this dispute" over indemnification. 657 F.Supp. at 407. Turning next, however, to ascertain "whether legal constraints external to the parties' agreement foreclosed the arbitration of those claims," *Mitsubishi Motors Corp. v. Soler Chrysler–Plymouth, Inc.*, 473 U.S. 614, 628, 105 S.Ct. 3346, 3355, 87 L.Ed.2d 444 (1985), the court held that the arbitration clause was unenforceable. 657 F.Supp. at 408–09. The court noted that the issue of enforceability is neither strictly factual nor strictly legal, but rather involves a question of public policy. Since it must ultimately decide issues of public policy, the court concluded that it would expedite resolution of this dispute for it to decide the public policy issue at once rather than first to compel arbitration. Especially in view of the parties' representation "that they will not settle cases with passenger victims of the Chase, Maryland disaster until liability apportionment is clear," the court was "reluctant to submit to arbitration a case which cannot be finally decided by arbitrators." *Id.* at 409.

After further proceedings, the district court issued a judgment declaring that "if section 5.6 of the [Operating Agreement] is interpreted as requiring Amtrak to indemnify Conrail for damages ... caused by Conrail's or Conrail's employees gross negligence or willful or wanton misconduct that justifies the imposition of punitive damages, it is unenforceable because of public policy." Declaratory Judgment of Oct. 3, 1988. In an accompanying memorandum, the court found "that the parties did not clearly manifest a mutual intent at the time they executed the [Operating Agreement] for the indemnification provisions therein to apply to accidents caused by [aggravated misconduct]." It went on to opine that "public policy will not allow enforcement of indemnification provisions that appear to cover such extreme misconduct because serious and significant disincentives to railroad safety would ensue."

Against this background, Conrail argues first that the district court should have referred its indemnification dispute with

Amtrak, pursuant to the agreements between them, to the NAP. In the alternative, it asserts that there is no clearly articulated public policy precluding enforcement of the indemnification clauses in this case, and that the court misinterpreted the Operating Agreement insofar as it found any ambiguity in the scope of the indemnification clauses and resolved that ambiguity by reference to parol evidence of the parties' intent.

## II. ANALYSIS

The parties to this dispute each emphasize a different theme repeated frequently in Supreme Court opinions. Thus, Conrail emphasizes that the Federal Arbitration Act "strongly favors the enforcement of agreements to arbitrate as a means of securing 'prompt, economical and adequate solution of controversies,'" *Rodriguez de Quijas v. Shearson/American Express, Inc.*, —— U.S. ——, 109 S.Ct. 1917, 1919, 104 L.Ed.2d 526 (1989) (*quoting* and *overruling Wilko v. Swan*, 346 U.S. 427, 438, 74 S.Ct. 182, 188, 98 L.Ed. 168 (1953)), and the corollary that, "as a matter of federal law, any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration," *Moses H. Cone Memorial Hospital v. Mercury Construction Corp.*, 460 U.S. 1, 24–25, 103 S.Ct. 927, 941–42, 74 L.Ed.2d 765 (1983); *see also Pearce v. E.F. Hutton Group, Inc.*, 828 F.2d 826, 829–30 (D.C.Cir.1987).

Amtrak does not dispute these nostrums, of course, but emphasizes the coexistent proposition that, notwithstanding the parties' contractual allocation of authority to the NAP, " '[a] question of public policy is ultimately one for resolution by the courts.' " *United Paperworkers International Union v. Misco, Inc.*, 484 U.S. 29, 108 S.Ct. 364, 373, 98 L.Ed.2d 286 (1987) (*quoting W.R. Grace & Co.*, 461 U.S. at 766, 103 S.Ct. at 2183). From this general theorem, Amtrak purports to derive "an important corollary" of its own: "district courts may refuse to compel arbitration of public policy issues and instead resolve those questions themselves." At this point, Conrail joins issue, arguing that "[t]he exception that allows a court to refuse enforcement of an arbitration award on the grounds that it violates established law or seeks to compel unlawful action is extremely narrow...."

Returning to the terms of the Arbitration Act itself, we see that § 3 of that statute unambiguously requires that a court, "upon being satisfied that [an] issue ... is referable to arbitration under [a written] agreement, shall ... stay the trial of the action until such arbitration has been had in accordance with the terms of the agreement." Similarly, § 4 provides that a court, upon petition and "upon being satisfied that the making of the agreement for arbitration or for the failure to comply therewith is not in issue, ... shall make an order directing the parties to proceed to arbitration in accordance with the terms of the agreement." As the Supreme Court has said with reference to these two provisions, "[b]y its terms, the Act leaves no place for the exercise of discretion by a district court, but instead mandates that district courts *shall* direct the parties to proceed to arbitration on issues as to which an arbitration agreement has been signed." *Dean Witter Reynolds Inc. v. Byrd*, 470 U.S. 213, 218, 105 S.Ct. 1238, 1241, 84 L.Ed.2d 158 (1985) (emphasis in original).

In this case, there is no question that the parties agreed to arbitrate this dispute. They agreed (with an exception not here relevant) to arbitrate "any claim or controversy between [them] concerning the interpretation, application or implementation" of the Operating Agreement. The district court specifically found "that the parties intended to arbitrate this dispute," and Amtrak does not dispute the point on appeal. Nor is there any doubt that Amtrak has failed to comply with the arbitration provision. Accordingly, unless this case comes within the exception found in § 2 of the Arbitration Act, §§ 3 and 4 of that statute required the district court, at the instance of Conrail, to compel Amtrak to submit to arbitration.

Section 2 of the Arbitration Act provides that an arbitration clause in a contract involving interstate commerce "shall be

valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. In this case, however, the district court declined to compel arbitration because the indemnification provision that the proponent of arbitration sought to enforce "may be invalid on public policy grounds," depending, of course, upon how it is finally interpreted. "In so holding," the court recognized that it "slightly expands the exception to arbitration embodied in section 2" of the Act. 657 F.Supp. at 408.

First to the obvious: the amplification inherent in the interpretive process aside, courts simply are not authorized to "expand" a statutory provision beyond its intended reach. Second, to the district court's view that its holding is "consonant with prior decisional law [because] there are undoubtedly 'grounds [that] exist at law' to hold a contract provision illegal and unenforceable on the basis of public policy," id., we think that it erred in treating the arbitration clause as unenforceable merely because the substantive contract provision in dispute between the parties may—if the district court is correct about public policy—be unenforceable.

As we read the Act, the presence of a public policy issue that may preclude enforcement of the contract is not such a "ground[ ] as exist[s] at law or in equity for the revocation of any contract" within the meaning of § 2. To the contrary, the language of § 2 (which speaks to revocation of the arbitration clause, not of the contract), especially when read in conjunction with § 4 (which directs the court to order arbitration if the agreement to arbitrate was made but not honored), indicates that Congress created an exception to the general rule (that an arbitration clause will be enforced by its terms) only when there is a flaw in the formation of the agreement to arbitrate. Thus, the Supreme Court has noted that "courts should remain attuned to well-supported claims that the agreement to arbitrate *resulted from* the sort of fraud or overwhelming economic power that would provide grounds 'for the revocation of any contract.'" *Mitsubishi*, 473 U.S. at 627, 105 S.Ct. at 3354 (emphasis added). Thus, we distinguish between a claimed infirmity that affects the validity of the arbitration clause—either in isolation or because it invalidates the contract of which it is a part—and a claimed infirmity that relates only to another part of the contract subject to arbitration. In the latter situation, as exemplified by the case before us, the arbitration clause is unimpaired and must be enforced; it is for the arbitrator then to determine what the contract requires and, if any question of public policy is still implicated under the contract as interpreted, it "is ultimately one for resolution by the courts." *W.R. Grace & Co.*, 461 U.S. at 766, 103 S.Ct. at 2183.

Amtrak tries to avoid this analysis by invoking *Mitsubishi*, in which the Supreme Court approved a two-step inquiry for determining whether a statutory claim is arbitrable: we are to ask first whether the parties agreed to arbitrate the dispute, and if so, whether any "legal constraints external to the parties' agreement foreclose[ ] [its] arbitration." 473 U.S. at 628, 105 S.Ct. at 3354. It is clear from the *Mitsubishi* decision itself that a general public policy is not the type of external legal constraint that can make an arbitration clause unenforceable. The Supreme Court did not remotely suggest that some substantive issues are inherently outside the ambit of arbitration, but only that an arbitrator cannot decide an issue if there is a limitation in positive law—statutory or, of course, contractual—upon his power to do so. *Id.* at 627, 105 S.Ct. at 3354 ("Just as it is the congressional policy manifested in the Federal Arbitration Act that requires courts liberally to construe the scope of arbitration agreements covered by that Act, it is the congressional intention expressed in some other statute on which the courts must rely to identify any category of claims as to which agreements to arbitrate will be held unenforceable."); *see also Shearson/American Express Inc. v. McMahon*, 482 U.S. 220, 226–27, 107 S.Ct. 2332, 2337–38, 96 L.Ed.2d 185 (1987) ("The burden is on the party opposing arbitration ... to show that Congress intended to pre-

clude a waiver of judicial remedies for the statutory rights at issue."); *cf. Northwest Airlines, Inc. v. Air Line Pilots Ass'n, Int'l,* 808 F.2d 76, 81 (D.C.Cir.1987) ("The fact that the arbitration touches on issues related to airline safety is irrelevant. There have been numerous arbitrations under the RLA involving grievances that implicate safety issues, and no court has ever ruled that an arbitral board lacked jurisdiction to consider such issues.").

Amtrak asserts nonetheless that "[i]t would in fact be extraordinary if a clearly-defined, dispositive public policy could *not* be invoked to pretermit arbitration." (Emphasis in original.) In order to bring home its point, Amtrak asks us to "[s]uppose two private parties enter into an agreement, including an arbitration clause, to commit some illegal or immoral act (*e.g.,* a contract for money-laundering or murder.)" Although it assures us that it would be absurd for a court to compel the arbitration of a dispute arising from such a contract, we do not think it would be at all out of the ordinary. Suppose, for example—no more, and probably less, far-fetched than Amtrak's hypothetical in which we must imagine that a murder-for-hire customer proclaims himself by seeking judicial assistance to compel arbitration—that the parties have also adopted by practice to a certain trade lexicon, in which otherwise ominous terms have an inoffensive meaning. It is precisely so that an arbitrator may interpret and apply those terms that the parties agreed to arbitration. Thus, we have stressed before that the policy favoring arbitration "is at its strongest where the arbitration will be governed by procedures specifically tailored to the context from which the agreement to arbitrate arises, and will be conducted by arbitrators who are expert in the norms and practices of the relevant industry," *Pearce,* 828 F.2d at 829, such as the NAP in this case. For a court to intervene before the arbitrator has determined what the contract means, and what it requires in the particular circumstances of their dispute, because he may determine that it requires the performance of an unlawful act, prematurely disrupts the system of private ordering upon which

"public policy"—as declared in the Arbitration Act and in the Supreme Court cases liberally interpreting it—places maximum possible reliance. As counsel for Conrail pointed out during oral argument, "it is quite possible that the arbitrator could enter an award [on] the duty to defend and never reach the [indemnification issue], finding that the breach of the duty to defend had made Amtrak absolutely liable for the damages paid to the victims of the accident."

In sum, if parties have validly agreed to submit a dispute to arbitration, we see no reason not to enforce that agreement. If the arbitrator construes the contract so as to require someone to commit an illegal act, a court can then refuse to enforce the arbitrator's decision. A court cannot, however, bypass the arbitration process simply because a public policy issue might arise.

Amtrak points to only two cases to support the district court's decision declining to compel arbitration and granting declaratory relief instead. The first is *Alabama Great Southern Railroad Co. v. Louisville & Nashville Railroad Co.,* 127 F.Supp. 363 (N.D.Ala.), *rev'd on other grounds,* 224 F.2d 1 (5th Cir.1955), in which the district court declined to compel arbitration of an indemnification dispute similar to the one presented in this case. We are not impressed with that decision, however; it arose from the period of judicial hostility to arbitration that the Supreme Court has long since declared at an end. Indeed, that Amtrak could dig up only this antediluvian shard of a direct support shows the weakness of its position.

The other case, *Hanes Corp. v. Millard,* 531 F.2d 585 (D.C.Cir.1976), does not support Amtrak's position. In that case, we held that the district court should have ordered arbitration of a statute of limitations issue, *id.* at 600, while suggesting in dictum that it would not be amiss to resolve issues of the validity and scope of a United States patent, because of the complexity and technical nature of the issues, with which the arbitrators ("particularly if ... not lawyers or [if] citizens of a foreign country") may not be familiar. *Id.* at 592–

94. Insofar as it rests upon the notion that the complexity of a dispute can put it beyond the power of an arbitrator, the rationale of *Hanes* has since been disapproved by the Supreme Court. *See McMahon*, 482 U.S. at 239, 107 S.Ct. at 2344 ("We determined in *Mitsubishi* ... that 'potential complexity should not suffice to ward off arbitration.'"). To the extent that it is peculiar to patent issues, *Hanes* has been implicitly overruled by statute. *See* 35 U.S.C. § 294 (making enforceable agreements to arbitrate contract disputes "relating to patent validity"). Moreover, even in that case we urged the district court to refer the matter to arbitration in hope that the royalty issue would be dispositive and thus obviate the need to resolve the more complex issues. 531 F.2d at 600. The dispute before us is obviously susceptible to the same approach. Rather than decide the thorny issue of public policy, the court should have referred the matter to arbitration, thereby possibly obviating the need ever to address the issue.

Amtrak refers us also to two recent decisions in which a court vacated an arbitrator's award on public policy grounds related to safety. *See Stead Motors v. Automotive Machinists Lodge 1173*, 843 F.2d 357 (9th Cir.1988) (vacating, based upon general California safety statutes, arbitrator's reinstatement of a reckless auto mechanic); *Iowa Electric Light & Power Co. v. Local Union 204*, 834 F.2d 1424 (8th Cir.1987) (vacating, in the interest of public health and safety, arbitrator's reinstatement of nuclear power plant employee discharged for violating safety regulations). We think it more significant, though, that in each case the court confronted the public policy issue only after the arbitrator had rendered a decision. In contrast, the district court here bypassed the arbitration process completely, despite the mandatory language of the Arbitration Act.

Nor are we persuaded by Amtrak's argument that allowing the district court to deny a motion to compel arbitration of a dispute when a public policy issue may be involved is an efficient order of proceeding because the court will ultimately have to decide the policy issue anyway. While only a court may ultimately be able to decide the public policy issue, a court's refusal to compel arbitration may in fact slow down its ultimate resolution by entangling itself in the dispute unnecessarily. Had this case been submitted to arbitration, and had the NAP concluded that the contract did not require Amtrak to indemnify Conrail for the damages in issue, the district court would presumably never have had to address the public policy issue at all. Instead, it consumed a year and a half doing so before clearing the way for arbitration to proceed in the light of its opinion on public policy. In any event, even if it were more efficient for the district court to resolve the public policy issue before submitting the contract issues to arbitration, that is simply not what Congress has ordained.

### III. CONCLUSION

In the context of collective bargaining agreements, this court has almost uniformly referred to arbitration any dispute even arguably subject thereto, ever since the Supreme Court decided *United Steelworkers of America v. Warrior & Gulf Navigation Co.*, 363 U.S. 574, 80 S.Ct. 1347, 4 L.Ed.2d 1409 (1960). Although perhaps less noticed, we have for the past 30 years also consistently enforced private non-labor agreements to arbitrate that we found were applicable by their terms to the dispute before us. Two trivial exceptions are *Blount Brothers Construction Co. v. Troitino*, 381 F.2d 267 (D.C.Cir.1967) (affirming without explanation district court decision not to refer claim to arbitration), and *Hanes Corp. v. Millard*, which, as explained above, is no longer good law. In order finally to remove any doubt that may still linger, we now make explicit what has long been true: we simply do not countenance the attempt of a party to a properly formed arbitration agreement to avoid its obligations to submit to arbitration. Litigants will save time and effort for themselves and for the courts by keeping that in mind.

Because we hold that this dispute should be submitted to arbitration, we find it unnecessary to address the other issues that

the parties present. The issues of contract interpretation are for the NAP. Those of public policy, if they are live following arbitration, may be re-presented for judicial resolution. We therefore vacate the court's declaratory judgment and reverse its order denying Conrail's motion to compel arbitration.

*So ordered.*